# GOMPERS *v.* BUCK'S STOVE & RANGE COMPANY.

CONTEMPT OF COURT; APPEALS; EQUITY; BILLS OF EXCEPTION; TEMPORARY INJUNCTION.

1. Criminal contempts of court consist in such disobedience of the mandates or decrees of the court as constitutes a defiance of the court's power and authority, and for which the guilty party is punishable by

fine or imprisonment; while civil contempts consist in the refusal of the parties to do something which they are ordered to do for the benefit and advantage of the opposing parties, and for which they stand committed until they comply with the court's order.

2. An order in an equity suit finding the defendants guilty of contempt of court for having disobeyed a previous restraining order will be considered as an interlocutory order, and reviewable on appeal as a part of the original cause, only where the contempt was a civil one; if it was a criminal contempt, the order will be deemed to have been made in a proceeding separate from the original cause; and it is immaterial that the alleged contempt was brought to the lower court's attention by petition of the complainant, and not by the prosecuting officer of the government.

3. Where, on a petition of the complainant in an equity suit, charging the defendants with specific acts of disobedience of a previous restraining order, and on the answers of the defendants to the petition, and testimony taken by the parties, the court makes an order finding the defendants guilty of contempt for having violated the restraining order, as charged, and sentences them to imprisonment therefor, an appeal from such order by the defendants will lie; but the contempt being a criminal, and not a civil, one, in the absence from the record on appeal of a bill of exceptions or its equivalent, the appellate court will consider only the pleadings and order itself, and will presume that the evidence was sufficient to support the finding of the court.

4. *Quære,* whether acts of disobedience by the defendants in an equity cause of a restraining order, committed between the signing of the order by the court and the filing by the complainant of the bond required by equity rule 42 of the lower court, constitute contempt of court.

5. Contempt of court may be committed by innuendo and insinuation, and may consist of maliciously saying or doing anything that will have a tendency of inducing others to disregard the authority of the court.

6. Where, in a suit for an injunction by a manufacturing company against a labor organization and its officers and members, the court made an order restraining the defendants *pendente lite* from prosecuting or aiding in the prosecution of a boycott against the complainant and its products, and from printing the complainant's name in the "We Don't Patronize" and "Unfair" list of the official publication of the organization, and subsequently, on petition of the complainant, made a further order finding certain of the defendants guilty of contempt of court for having circulated an edition of such publication, printed before the date of the restraining order, and containing the name of the complainant in such list, and also of having made various statements in public speeches and in editorials printed in

such publication, with intent to cause the members of the organization and their friends to disobey the injunction and continue the boycott, and which had that effect, it was *held*, on an appeal by the defendants, affirming the contempt order, that while such statements might not, if literally interpreted, constitute a technical contempt, yet, as the manifest intent of the defendants was not only to disobey the restraining order themselves, but also to inspire their followers to do likewise, their acts were to be regarded as contempt of court. (Mr. Chief Justice Shepard dissenting.)

7. Where a labor organization and its officers have been enjoined from aiding in a boycott against a manufacturing company and its products, and from printing the company's name in the "Unfair" list of the official publication of the organization, the act of one of such officers in presiding at and taking part in the deliberations of a labor convention at which a resolution was adopted placing the products of such manufacturer on the "Unfair" list, and fining any member who should purchase any such products, and providing for expulsion from the order for nonpayment of any such fine, is a violation of the injunction, and constitutes contempt of court.

8. Where the finding of the court below in a contempt proceeding, that the accused was guilty of certain acts which constitute contempt of court, is sufficient to support the sentence of imprisonment which the court imposed, and the penalty imposed is not greater than could have been inflicted had such acts constituted the only offenses charged, it is not necessary for the appellate court, on appeal from such finding, to consider other acts which the court below also found the accused was guilty of committing and which it held also to be contempt of court.

9. On an appeal from an order adjudging the defendants in an equity suit guilty of contempt of court for violating a previous restraining order pending an appeal therefrom, which restraining order, pending the appeal from the contempt order, was modified by this court in certain particulars, this court will not consider the question whether the restraining order was void or merely erroneous in the respects in which it was modified, where the lower court, in the contempt order, found the defendants also guilty of violating provisions of the restraining order which this court, on appeal, affirmed and approved.

10. The high character and distinguished position of the defendants in an equity suit who have been adjudged guilty of criminal contempt of court for disobeying a previous order restraining them from aiding in the prosecution of a boycott cannot properly be considered by this court as a reason for reversing the contempt order on an appeal therefrom. Such matters are for the consideration of the pardoning power.

No. 1990. Submitted April 20, 1909. Decided November 2, 1909.

HEARING on an appeal by the defendants from an order of the Supreme Court of the District of Columbia, adjudging them guilty of contempt of court for violation of a previous restraining order of that court, and sentencing them to imprisonment; and also on a motion by the appellee to dismiss such appeal.                            *Order affirmed.*

The COURT in the opinion stated the facts as follows:

This cause was appealed from a decree of the supreme court of the District of Columbia adjudging appellants, Samuel Gompers, Frank Morrison, and John Mitchell, guilty of contempt of court. For convenience, appellants will be referred to hereafter as defendants, and appellee, The Buck's Stove & Range Company, as complainant.

On the 19th day of August, 1907, a bill of complaint was filed by the complainant corporation in the supreme court of the District of Columbia, praying for an order of injunction restraining certain parties, among whom were these defendants, from conducting a boycott against the business of complainant. On the 18th day of December, 1907, the temporary restraining order set forth in the petition herein, was entered.

The bond required by the court to be filed to indemnify the defendants against any damage they might sustain by reason of the order was filed by complainant on the 23d day of December, 1907. The temporary restraining order, therefore, did not become effective until that date. Thereafter, evidence was taken by the respective parties, and, on hearing, the court, on March 23, 1908, entered a decree making the temporary injunction perpetual as to the original defendants.

From the final decree making the temporary injunction perpetual, an appeal was taken to this court. No supersedeas bond was given nor any action taken by the defendants to stay the judgment. On hearing, this court (33 App. D. C. 83) modified the decree to read as follows:

"This cause came on to be heard on the transcript of the

record from the supreme court of the District of Columbia, and was argued by counsel.

"On consideration whereof, it is now here ordered, adjudged, and decreed by this court that the decree of the said supreme court in this cause be, and the same is hereby, modified and affirmed as follows: It is adjudged, ordered, and decreed that the defendants, Samuel Gompers, Frank Morrison, John B. Lennon, James Duncan, John Mitchell, James O'Connell, Max Morris, Denis A. Hayes, Daniel J. Keefe, William D. Huber, Joseph F. Valentine, Rodney L. Thixton, Clinton O. Buckingham, Herman C. Poppe, Arthur J. Williams, Samuel R. Cooper, and Edward L. Hickman, individually and as representatives of the American Federation of Labor, their and each of their agents, servants, and confederates, be, and they hereby are, perpetually restrained and enjoined from conspiring or combining to boycott the business or product of complainant, and from threatening or declaring any boycott against said business or product, and from abetting, aiding, or assisting in any such boycott, and from directly or indirectly threatening, coercing, or intimidating any person or persons whomsoever, from buying, selling or otherwise dealing in complainant's product, and from printing the complainant, its business or product, in the 'We Don't Patronize' or 'Unfair' list of defendants in furtherance of any boycott against complainant's business or product, and from referring, either in print or otherwise, to complainant, its business or product, as in said 'We Don't Patronize' or 'Unfair' list in furtherance of any such boycott."

This cause arose out of the alleged disobedience by these defendants of the decree of the court below. On July 20, 1908, complainant filed a petition in the original cause in equity, charging the defendants Samuel Gompers, Frank Morrison, and John Mitchell with wilful and premeditated violations of both the temporary and perpetual injunctions, and with a total disregard of the same, and, in so doing, they are charged with

acting in gross and wilful contempt, of the authority of the court. The petition in full appears in the margin.*

On the same day the petition in the present case was filed, a citation was issued requiring the defendants, on or before the 8th day of September, 1908, to appear and show cause why they should not be adjudged in contempt of the order and decree of the court. Within the time allowed, the defendants appeared

---

*Petition.

In the Supreme Court of the District of Columbia.

No. 27305.   Equity.

THE BUCK'S STOVE & RANGE COMPANY, Plaintiff,
*vs.*
THE AMERICAN FEDERATION OF LABOR ET AL., Defendants.

The petition of the Buck's Stove & Range Company respectfully shows to the court as follows:

I.

It is a body corporate, organized and existing under the laws of the State of Missouri.

II.

Heretofore, to wit: the 19th day of August, A. D. 1907, your petitioner filed in this cause its original bill of complaint, naming as defendants, among others, Samuel Gompers, Frank Morrison, and John Mitchell, who duly answered the bill and afterwards filed an amended answer to the same, both the said answer and the amended answer being made jointly by them and their codefendants.

This cause came on to hearing on an application for a temporary injunction, and thereafter, to wit; the 18th day of December, A. D. 1907, after full hearing, the court, upon consideration of the said application for an injunction *pendente lite,* and of the evidence submitted with respect thereto, passed and entered in this cause its order enjoining and restraining the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, from interfering with the plaintiff in the conduct of its business, the said order being in terms as follows:

This cause coming on to be heard upon the petition of the complainant for an injunction *pendente lite* as prayed in the bill, and the defendants' re-

and answered separately, substantially admitting the facts alleged in the petition in so far as they directly applied to them individually or collectively; but each specifically denying any intention to disregard or treat with contempt the decrees of the court. As we shall later observe, the answers, in the state of this record, become of little importance in the disposition of this appeal.

A voluminous amount of evidence was taken by the respec-

turn to the rule to show cause issued upon the said petition, having been argued by the solicitors for the respective parties, and duly considered, it is thereupon by the court, this 18th day of December, A. D. 1907, ordered that the defendants, the American Federation of Labor, Samuel Gompers, Frank Morrison, John B. Lennon, James Duncan, John Mitchell, James O'Connell, Max Morris, Denis A. Hayes, Daniel J. Keefe, William D. Huber, Joseph F. Valentine, Rodney L. Thixton, Clinton O. Buckingham, Herman C. Poppe, Arthur J. Williams, Samuel R. Cooper, and Edward L. Hickman, their and each of their agents, servants, attorneys, confederates, and any and all persons acting in aid of or in conjunction with them or any of them, be, and they hereby are, restrained and enjoined until the final decree in said cause from conspiring, agreeing, or combining in any manner to restrain, obstruct, or destroy the business of the complainant, or to prevent the complainant from carrying on the same without interference from them or any of them, and from interfering in any manner with the sale of the product of the complainant's factory or business by defendants, or by any other person, firm, or corporation, and from declaring or threatening any boycott against the complainant, or its business, or the product of its factory, or against any person, firm, or corporation engaged in handling or selling the said product, and from abetting, aiding, or assisting in any such boycott, and from printing, issuing, publishing, or distributing through the mails, or in any other manner, any copy or copies of the American Federationist, or any other printed or written newspapers, magazine, circular, letter, or other document or instrument whatsoever, which shall contain or in any manner refer to the name of the complainant, its business or its product in the "We Don't Patronize," or the "Unfair" list of the defendants, or any of them, their agents, servants, attorneys, confederates, or other person or persons acting in aid of or in conjunction with them, or which contains any reference to the complainant, its business or product, in connection with the term "Unfair" or with the "We Don't Patronize" list, or with any other phrase, word, or words of similar import, and from publishing or otherwise circulating, whether in writing or orally, any statement or notice, of any kind or character whatsoever, calling attention to

tive parties.    On hearing, the court entered the following decree :

"Now come the parties, by their attorneys, and the respondents, Samuel Gompers, Frank Morrison, and John Mitchell, in their proper persons, and this cause having been submitted to the court on, to wit, the 17th day of November, A. D. 1908, upon the petition of the complainant for a rule upon the respondents Samuel Gompers, Frank Morrison, and John Mitchell, to show

the complainant's customers, or of dealers or tradesmen, or the public, to any boycott against the complainant, its business or its product, or that the same are, or were, or have been declared to be "Unfair," or that it should not be purchased or dealt in or handled by any dealer, tradesman, or other person whomsoever, or by the public, or any representation or statement of like effect or import, for the purpose of, or tending to, any injury to or interference with the complainant's business, or with the free and unrestricted sale of its product, or of coercing or inducing any dealer, person, firm, or corporation, or the public, not to purchase, use, buy, trade in, deal in, or have in possession, stoves, ranges, heating apparatus, or other product of the complainant, and from threatening or intimidating any person or persons whomsoever from buying, selling, or otherwise dealing in the complainant's product, either directly, or through orders, directions, or suggestions to committees, associations, officers, agents, or others, for the performance of any such acts or threats as hereinabove specified, and from in any manner whatsoever impeding, obstructing, interfering with, or restraining the complainant's business, trade, or commerce, whether in the State of Missouri, or in other States or Territories of the United States, or elsewhere wheresoever, and from soliciting, directing, aiding, assisting, or abetting any person or persons, company or corporation, to do or cause to be done any of the acts or things aforesaid.

And it is further ordered by the court that this order shall be in full force, obligatory and binding upon the said defendants and each of them, and their said officers, members, agents, servants, attorneys, confederates, and all persons acting in aid of or in conjunction with them, upon the service of a copy thereof upon them or their solicitors or solicitor of record in this cause; Provided, The complainant shall first execute and file in this cause, with a surety or sureties to be approved by the court or one of the justices thereof, an undertaking to make good to the defendants all damage by them suffered or sustained by reason of wrongfully and inequitably suing out this injunction, and stipulating that the damages may be ascertained in such manner as the justice of this court shall direct, and that, on dissolving the injunction, he may give judgment thereon against the

cause why they should not be adjudged in contempt, the answers of the said respondents, and the testimony taken thereunder, and after full argument by the solicitors of the parties, respectively, and the same having been duly considered by the court, it now finds the fact to be that, on or about the 24th day of January, 1908, while the injunction *pendente lite,* of December 18,

---

principal and sureties for said damages in the decree itself dissolving the injunction.

(Signed)                              Ashley M. Gould, Justice.

Thereafter, to wit: the 23d day of December, A. D. 1907, an undertaking, in manner and form as required in and by the said order, was entered into and given by the petitioner, and was filed in the cause and approved by the court, whereupon the said order restraining and enjoining the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, became operative, binding, and effective, of which the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, then and there had notice.

### III.

Thereafter evidence was taken on behalf of the plaintiff and of the defendants, and the cause duly came on for hearing upon the pleadings and the evidence, and, having been duly considered, a final decree was entered in this cause, to wit: the 23d day of March, A. D. 1908, perpetually restraining and enjoining the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, from conspiring, agreeing, or combining to restrain, obstruct, or destroy the business of the complainant, and from interfering in any manner with the sale of the product of the complainant's factory, and from doing other things, performing or committing other acts more fully set out in the said decree, which, in terms, is as follows:

In the Supreme Court of the District of Columbia.

No. 27305.   Equity.

THE BUCK'S STOVE & RANGE COMPANY:
*vs.*
THE AMERICAN FEDERATION OF LABOR ET AL.

Final Decree.

The above-entitled cause coming on at this time for final hearing, and

1907, was, and was by them known to be, in force, the said respondents published and caused to be widely disseminated a paper signed by them, and which they caused to be accompanied by another paper, therein referred to as an editorial from the February, 1908, Federationist, which papers, in violation of the express mandates of the said injunction, made reference to

having been submitted to the court by the respective parties, through their solicitors, upon the pleadings and the evidence, and having been duly considered, it is thereupon by the court this 23d day of March, A. D. 1908, adjudged, ordered, and decreed that the defendants, the American Federation of Labor, Samuel Gompers, Frank Morrison, John B. Lennon, James Duncan, John Mitchell, James O'Connell, Max Morris, Denis A. Hayes, Daniel J. Keefe, William D. Huber, Joseph F. Valentine, Rodney L. Thixton, Clinton O. Buckingham, Herman C. Poppe, Arthur J. Williams, Samuel R. Cooper, and Edward L. Hickman, their and each of their agents, servants, attorneys, confederates, and any and all persons acting in aid of or in conjunction with them or any of them, be, and they hereby are, perpetually restrained and enjoined from conspiring, agreeing, or combining in any manner to restrain, obstruct, or destroy the business of the complainant, or to prevent the complainant from carrying on the same without interference from them or any of them, and from interfering in any manner with the sale of the product of the complainant's factory or business by defendants, or by any other person, firm, or corporation, and from declaring or threatening any boycott against the complainant or its business, or the product of its factory, or against any person, firm, or corporation engaged in handling or selling the said product, and from abetting, aiding, or assisting in any such boycott, and from printing, issuing, publishing, or distributing through the mails, or in any other manner, any copies or copy of the American Federationist, or any other printed or written newspaper, magazine, circular, letter, or other document or instrument whatsoever, which shall contain or in any manner refer to the name of the complainant, its business or its product in the "We Don't Patronize" or the "Unfair" list of the defendants, or any of them, their agents, servants, attorneys, confederates, or other person or persons acting in aid of or in conjunction with them, or which contains any reference to the complainant, its business or product, in connection with the term "Unfair" or with the "We Don't Patronize" list, or with any other phrase, word, or words of similar import, and from publishing or otherwise circulating, whether in writing or orally, any statement or notice, of any kind or character whatsoever, calling attention to the complainant's customers, or of dealers or tradesmen, or the public, to any boycott against the complainant, its business or its product, or that the same are, or were, or have been declared to be "Unfair," or that it should not

the fact that a boycott had been declared against the complainant, its business and its product, and that organized labor had asked its friends to use their influence and purchasing power in aid thereof, alleged that the said injunction was an invasion of the liberty of the press and of free speech, and declared that it could not 'compel union men or their friends to buy the Buck's stoves and ranges,' and that 'for this reason, the injunction will fail to bolster up the business of this firm, which it claims is so swiftly declining;' that, on or about the 25th day of January,

---

be purchased or dealt in or handled by any dealer, tradesman, or other person whomsoever, or by the public, or any representation or statement of like effect and import, for the purpose of, or tending to, any injury to or interference with the complainant's business, or with the free and unrestricted sale of its product, or of coercing or inducing any dealer, person, firm, or corporation, or the public, not to purchase, use, buy, trade in, deal in, or have in possession, stoves, ranges, heating apparatus, or other product of the complainant, and from threatening or intimidating any person or persons whomsoever from buying, selling, or otherwise dealing in the complainant's product, either directly, or through orders, directions, or suggestions to committees, associations, officers, agents, or others, for the performance of any such acts or threats as hereinabove specified, and from in any manner whatsoever impeding, obstructing, interfering with, or restraining, the complainant's business, trade, or commerce, whether in the State of Missouri, or in other States and Territories of the United States, or elsewhere wheresoever, and from soliciting, directing, aiding, assisting, or abetting any person or persons, company or corporation, to do or cause to be done any of the acts or things aforesaid.

And it is further adjudged, ordered, and decreed that the complainant recover against the defendants the cost of this suit, to be taxed by the clerk, and that it have execution therefor as at law.

(Signed)                              Harry M. Clabaugh,
                                            Chief Justice

### IV.

And upon the entering of the said final decree, the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, noted an appeal therefrom to the court of appeals of the District of Columbia, and perfected the said appeal by filing a bond for costs, which was duly approved by the court, but did not file a supersedeas bond or in any manner supersede or stay the said decree, and it is still in full force and effect, and binding

1908, the respondent John Mitchell, in like violation of the said boycott, combined with sundry persons, acting in aid of and in conjunction with himself and others of the defendants, in calling attention to the said boycott, and in giving notice that anyone of the 300,000 members of the United Mine Workers of America who should purchase a stove of the complainant's manufacture should be fined therefor and expelled from the said organization if the fine were not paid; that in April, 1908, when the permanent injunction of March 23d, 1908, was, and

upon the said defendants and each of them, the said Samuel Gompers, Frank Morrison, and John Mitchell, included.

#### V.

Reference is hereby made to the original bill and exhibits filed in support of the same, the answer and amended answer of the defendants, the testimony taken on both sides, the original order restraining and enjoining the defendants *pendente lite*, and the final decree in the cause, and each and every other paper and proceeding in this cause, from the institution of the suit to the filing of this petition; and it is prayed that the same may be taken and read as a part hereof at any and all hearings upon this petition, whether in this court or upon appeal from its decision herein rendered.

#### VI.

Notwithstanding the said order restraining and enjoining the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, passed by the court on the 18th day of December, A. D. 1907, and notwithstanding the final decree in the cause, passed on the 23d day of March, A. D. 1908, perpetually restraining and enjoining the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, all as above set out, the said Samuel Gompers, Frank Morrison, and John Mitchell have, since the filing of the said bill and the passage and entry of the said order, as well as of the final decree, frequently, regularly, and systematically, wilfully and with premeditation, violated the said order and the said final decree alike, and have totally disregarded the same; and, in so doing, they have acted in gross and wilful contempt of the authority of the court and its order and action in the premises, as hereinafter set out; the said Samuel Gompers having, some ten years ago, suggested the course of conduct which has been pursued in this case by him and by the said Frank Morrison and John Mitchell, and all of them having since repeated that suggestion.

was by them known to be, in full force, the respondents Samuel Gompers and Frank Morrison, in violation thereof, published in the said American Federationist, and widely disseminated, a letter, signed by them and addressed to the numerous state branches and central bodies of the defendant the American Federation of Labor, requesting them to 'bear in mind that an in-

---

VII.

Heretofore, to wit: the 13th day of December, A. D. 1897, at the convention of the defendant American Federation of Labor, held at Nashville, Tennessee, the said Samuel Gompers, being then, as now, the president of the said defendant American Federation of Labor, in reporting, as its president, to the convention of the said defendant, used the following language, to be found at pages 23 and 24 of the official report of the proceedings of the American Federation of Labor for the year 1897, which were prepared, authenticated, and circulated by the said Frank Morrison, he being then, as now, Secretary of the defendant American Federation of Labor, and which were published by order of the said convention, and, by like order, republished by the said Frank Morrison in or about the year 1905:

Boycotts and Court Decisions.

Recently one of the branches of the Federal courts decided by a majority vote that the boycott is illegal. Whether the decision rendered is applicable to all cases or simply to the one immediately under consideration has not yet fully transpired. It is manifest that the workers should have the same right which other citizens enjoy, the right which neither constitutions grant nor courts can deny,—the right to stand by our friends, patronize our sympathizers and co-operators, and to withhold our patronage from those who are antagonistic to us and our cause; and the further right to acquaint our people with our preferences. While there is no desire here to argue in favor of our rights, we should demand the change of any law which curbs the privilege and the right of the workers to exercise their normal and natural preferences. In the meantime, we should proceed as we have of old, and wherever a court shall issue an injunction restraining any of our fellow workers from placing a concern hostile to labor's interest on our unfair list, enjoining the workers from issuing notices of this character, the further suggestion is made that, upon any letter or circular issued upon a matter of this character, after stating the name of the unfair firm and the grievance complained of, the words, "We have been enjoined by the courts from boycotting this concern," could be added with advantage.

And the conduct and acts of the said Samuel Gompers hereinafter set

junction issued by a court in no way compels labor or labor's friends to buy the product of the Van Cleave Buck's Stove & Range Company of St. Louis. Fellow workers, be true and helpful to yourselves and to each other. Remember that united effort in the cause of right and justice must triumph;' and the court further finds as a fact that the respondents Samuel Gom-

---

out have been designed and carried out in accordance with the scheme or plan so outlined by him at the convention of the defendant American Federation of Labor, held at Nashville in December, 1897.

## VIII.

And, when on the stand as a witness for the defendants in this cause, on January 30, 1908, the attention of the said Samuel Gompers, on cross-examination, was called to the portion of his report to the Nashville, 1897, convention, set out in the last paragraph of this petition, and he was thereupon interrogated, and replied in respect to the same, as follows:

*Q.* Have you ever recalled that suggestion?

*A.* No, sir; I would rather reaffirm it.

*Q.* You would reaffirm it?

*A.* It is a very long quotation, and my answer requires some little amplification of it, so that I may be fully understood.

*Q.* This is the particular part to which I desire to direct your attention. (reading):

"In the meantime we should proceed as we have of old, and wherever a court shall issue an injunction restraining any of our fellow workers from placing a concern hostile to labor's interest on our unfair list, enjoining the workers from issuing notices of this character, the further suggestion is made that, upon any letter or circular issued upon a matter of this character, after stating the name of the unfair firm and the grievance complained of, the words, 'We have been enjoined by the courts from boycotting this concern, could be added with advantage."

You have stated that you have never recalled that?

*A.* No, sir; I have never recalled it, and I think—you can imagine that, in a report, the whole subject cannot be comprehended.

*Q.* You can explain it later. You have answered it sufficiently. We want to get along.

*A.* Just let me make a memorandum, then, so that I will not forget it.

And on redirect examination, he was asked the following question and made the following answer:

*Q.* In asking you about the report of 1897, Mr. Davenport said you made reference to a decision then which enjoined boycotts, and which, in your report, you said whether it was general or not, you could not determine, etc., and then you requested to be permitted at that time to go on and say some-

pers, Frank Morrison, and John Mitchell are guilty of the several acts charged in paragraphs 17 and 26 of the complainant's petition, that the said respondents Gompers and Morrison are guilty of the several acts charged in the 16th and 20th paragraphs of the said petition, that the respondent Morrison is guilty of the acts charged in the 25th paragraph of the said peti-

---

thing further; but you were not allowed to do so. Is there anything now that you care to say about that report?

*A.* I suggested to the organizations of labor that they make the statement that they had been enjoined, if an injunction had been issued, by a court,— a single statement of fact.

### IX.

Thereafter, in the November, 1902, number of the American Federationist, of which the said Samuel Gompers was then, as he now is, its duly authorized editor, in the editorial column thereof, under the name of the said Samuel Gompers, at page 808, he printed and published the following:

"We beg to say plainly and distinctly to Mr. Merritt and fellow sympathizers that the American Federation of Labor will never abandon the boycott, and that the threats against the Federation are idle, impotent, and impudent."

The said. American Federationist, as set out in paragraph 4 of the original bill in this cause, is the official organ of the said defendant, American Federation of Labor, and has a wide circulation, not only among the members of the said Federation, but among the public generally.

### X.

The original bill in this cause having been filed on to wit: the 19th day of August, A. D. 1907, and the process of subpœna having been served upon the said Samuel Gompers, as a defendant named in the bill on to wit: the 20th day of August, A. D. 1907, thereafter, to wit; on the same day, or the day following, the said Samuel Gompers not only stated his intention of not complying with any order which might be passed by the court pursuant to the prayers of the said bill, but publicly stated such intention in an interview with the representatives of three prominent newspapers, and the said interview was extensively published throughout the country, including the city of Washington, in the District of Columbia. In the course of said interview so published, the said Samuel Gompers said: "When it comes to a choice between surrendering my rights as a free American citizen or violating the injunction of the courts, I do not hesitate to say that I shall exercise my rights, as between the two." This statement of the said Samuel

tion, and that the respondent Gompers is guilty of the several acts charged in the 19th, 21st, 22d, and 23d paragraphs thereof.

"And, the court being fully advised in the premises, it is by it, this 23d day of December, A. D. 1908, considered that the said respondents Samuel Gompers, Frank Morrison, and John Mitchell are guilty of contempt in their said disobedience of

Gompers, at or about the time of the filing of the bill in this cause, was made in accordance with, and pursuant to, the suggestion and purpose outlined by him at the Nashville convention above mentioned, ten years earlier.

XI.

Thereafter, to wit: on the 5th day of September, A. D. 1907, the said Samuel Gompers, at the Jamestown Exposition, in the course of his Labor Day speech, delivered as a public address, said:

"An injunction is now being sought from the supreme court of the District of Columbia against myself and my colleagues of the executive council of the American Federation of Labor. It seeks to enjoin us from doing perfectly lawful acts; to deprive us of our lawful and constitutional rights. So far as I am concerned, let me say that never have I, nor ever will I, violate a law. I desire it to be clearly understood that when any court undertakes without warrant of law, by the injunction process, to deprive me of my personal rights and my personal liberty guaranteed by the Constitution, I shall have no hesitancy in asserting and exercising those rights."

This language of the said Samuel Gompers was published broadly and generally in the daily press throughout the country, as he knew it would be. Not only so, but in the October, 1907, number of the American Federationist, he published the same at length in the editorial column of the said publication, under his own name, at page 789 thereof. And the said Samuel Gompers has, on numerous occasions since then, repeated and reaffirmed his said threats to violate any injunctive process of the court in this case which should be issued, and which has been issued, and is now in force, against him, and has carried out his said threats by persistently violating the said injunctive process.

XII.

In the same October, 1907, number of the American Federationist, at page 785, in the editorial column thereof, under his own name, after reciting on the preceding page the filing of the original bill in this cause and the institution of the present suit, the said Samuel Gompers used the following language, referring directly and specifically to this cause:

"So long as the right of free speech and free press obtains, we shall pub-

the plain mandates of the said injunctions; and it is, therefore, ordered and adjudged that the said respondent Frank Morrison be confined and imprisoned in the United States jail in the District of Columbia, for and during a period of six months; that the said respondent John Mitchell be confined and imprisoned in the said jail for and during a period of nine months; and that the respondent Samuel Gompers be confined and imprisoned in the said jail for and during a period of twelve months; said imprisonment as to each of said respondents to take effect from and including the date of the arrival of said respective respondents at said jail."

From this judgment the case comes here on appeal.

---

lish the truth in regard to all matters. If any person or association challenges the accuracy of any of our statements, we are willing to meet him or them in the courts and defend ourselves. So long as we do not print anything which is libelous or seditious, we propose to maintain our rights and exercise liberty of speech and liberty of the press. If, for any reason, at any time, the name of the Buck's Stove & Range Company does not appear upon the 'We Don't Patronize' list of the American Federationist (unless that company becomes fair in its dealings toward Labor), all will understand that the right of free speech and free press are denied us; but even this will not deprive us, or our fellow workmen and those who sympathize with our cause, from exercising their lawful right and privilege of withholding their patronage from the Van Cleave Company— the Buck's Stove & Range Company of St. Louis.

"So far as we are personally and officially concerned, we have fully stated our position in the American Federationist and elsewhere.

"Do not fail to keep the Buck's Stove & Range Company of St. Louis in mind, and remember that it is on the unfair list of organized labor of America."

### XIII.

And in the same October, 1907, number of the American Federationist, at pages 791 and 792 thereof, in the column headed "Editorial Notes," the said Samuel Gompers, referring to this cause, used the following language:

"So labor must not use its patronage as it will,—that is, if Van Cleave of Buck's Stove & Range Company fame has his way. But what vested right has that company in the patronage of labor or of labor's friends? It is their own to withhold or bestow as their interest or fancy may direct.

*Mr. Alton B. Parker, Mr. Jackson H. Ralston, Mr. Frederick L. Siddons,* and *Mr. William E. Richardson,* for the appellants:

## On the motion to dismiss.

It is not to be denied that where an order punishing a contempt of a court's decree, judgment, or order is inflicted on a person not a party to the suit in which the alleged violated decree or judgment was entered, or where the contempt proceedings have for their primary object punishment for violations of valid decrees or judgments, there are decisions of Federal courts which require that a review of the order inflicting the

---

"They have a lawful right to do as they wish, all the Van Cleaves, all the injunctions, all the fool or vicious opponents to the contrary notwithstanding.

"Wonder whether Van Cleave will try for an injunction compelling union men and their friends to buy the Buck's Stove & Range Company's unfair product?

"Until a law is passed making it compulsory upon labor men to buy Van Cleave's stoves we need not buy them, we won't buy them, and we will persuade other fair-minded, sympathetic friends to co-operate with us and leave the blamed things alone.

"Go to —— with your injunctions."

And, under the same heading, he published the following additional statement:

"The Buck's Stove & Range Company of St. Louis (of which Mr. Van Cleave is president) will continue to be regarded and treated as unfair until it comes to an honorable agreement with organized labor. And this, too, whether or not it appears on the 'We Don't Patronize' list."

Pursuant to said declarations and threats of the said Samuel Gompers, the name of petitioner has been retained and published in the "Unfair" list in the journal of the International Metal Polishers Union, described in the original bill in this cause, to wit: in its issues of November and December, 1907, and January, February, March, April, May, June, and July, 1908, as will be seen by reference to the said issues, herewith filed as exhibit petitioner No. 4.

### XIV.

Thereafter, on to wit: the 14th day of November, A. D. 1907, the application for an injunction *pendente lite* came on for hearing before the court.

punishment must be through the instrumentality of a bill of exceptions, an agreed case, or the like, as in the case of a review of a judgment entered in an action at law.    But the authority of these decisions has no application to a case like that presented in the proceeding at bar.    This appears, from the language of the court in *Bessette* v. *Conkey Co.* 194 U. S.

---

and the hearing of the same occupied several days, at the conclusion of which the cause was taken under consideration by the presiding justice.    After the cause had been submitted to the court, and before its decision in the premises had been rendered, the said Samuel Gompers and Frank Morrison, in anticipation of the granting of said application, and for the purpose of nullifying and defeating the effect of any injunction which should be issued in the premises, prepared, published, and distributed a circular letter, signed by the said Samuel Gompers and Frank Morrison, copies of which were by them transmitted and caused to be transmitted to the various unions affiliated with the American Federation of Labor in the several States and Territories of the United States and Canada, on or about its date, November 26, 1907, to the number of twenty-seven thousand, as will be seen by reference to the stipulation of counsel for the respective parties, filed in this cause on to wit: the 8th day of April, A D. 1908.    The said circular letter is, in part, as follows:

Mr. Van Cleave, for the Buck's Stove & Range Company, brought suit against the American Federation of Labor and its executive council, and has petitioned the court for an injunction to prohibit the American Federation of Labor from in any way advising organized labor and its friends of the fact that the Buck's Stove & Range Company is unfair to its employees, and for that reason its name is published upon the American Federation of Labor "We Don't Patronize" list.

The court will soon give a decision on the legal issue which has been raised.    We shall continue to maintain that we have the right to publish the name of the Buck's Stove & Range Company upon the "We Don't Patronize" list.    Should we be enjoined by the court from doing so, the merits of the case will not be altered, nor can any court decision take from any man the right to bestow his patronage where he pleases.

The said letter, so prepared, issued, and caused to be circulated by the said Samuel Gompers and Frank Morrison, further stated:

Bear in mind that you have a right to decide how your money shall be expended.

324, quoting with approval the language of Judge Sanborn, of the court of appeals for the eighth circuit, in *Re Nevitt,* 117 Fed. 448.

The distinction drawn between the different kinds of contempt proceedings in these cases is determinative of the motion to dismiss.    The order punishing. for contempt in this case was

---

You may or may not buy the products of the Buck's Stove & Range Company.

There is no law or edict of court that can compel you to buy a Buck's stove or range.

You cannot be prohibited from informing your friends and sympathizers of the reason why you exercise this right. You have also the right to inform business men handling the Buck's Stove & Range Company's products of its unfair attitude toward its employees, and ask them to give their sympathy and aid in influencing the Buck's Stove & Range Company to deal fairly with its employees and come to an honorable agreement with the union primarily at interest.

It would be well for you as central bodies, local unions, and individual members of organized labor and sympathizers, to call on business men in your respective localities, urge their sympathetic co-operation, and ask them to write to the Buck's Stove & Range Company of St. Louis, urging it to make an honorable adjustment of its relations with organized labor.

Act energetically and at once.    Report the result of your effort to the undersigned.

Sam'l Gompers,<br>
President American Federation of Labor.<br>
Frank Morrison,<br>
Secretary.

### XV.

And thereafter, to wit: the 17th day of December, A. D. 1907, the court filed its opinion in the cause, to the effect that the complainant was entitled to the injunction *pendente lite* as prayed in the original bill, and on to wit: the 18th day of December, A. D. 1907, passed the order set out in paragraph 2 of this petition.    The said order became operative and effective by the giving of the undertaking required by it on to wit: the 23d day of December, A. D. 1907, and has never been revoked or altered.    Notwithstanding the passage and entry of this order, and the taking effect of the same by the giving of the undertaking, as aforesaid, the said Samuel Gompers and Frank Morrison, having set in motion the instrumentalities devised by them for the obstruction and nullification of the order when en-

essentially remedial in its character.   It was made to enforce
obedience to the injunction, which was the prime object of the
bill of complaint filed by the petitioner, and the proceedings
leading to the order inflicting the punishment were initiated by
the petitioner and original complainant, it complaining, in sub-
stance, that the relief it had sought and which had been granted

---

tered, have failed to take any action whatever to prevent that result, but,
on the contrary, have since taken other steps, as will hereafter appear, for
the more effectual carrying out of the plan and purpose outlined in said
circular letter.

### XVI.

The order for an injunction *pendente lite* having been passed on the
18th day of December, A. D. 1907, and the injunction having taken effect
and become operative on the 23d day of December, A. D. 1907, as above
stated, the said Samuel Gompers, as will be seen by reference to his
deposition in this cause, hastened or "rushed" the publication of the Janu-
ary, 1908, issue of the American Federationist, with a view to circulating
the same during the time which should elapse between the passage of the
said order for an injunction, and the injunctive order itself.   The said Jan-
uary, 1908, number, at page 51, includes and publishes in full the "We
Don't Patronize" or "Unfair" list of the American Federation of Labor,
containing the name of petitioner; and at page 38 of the said issue, the
said Samuel Gompers published the following:

"A limited number of the American Federationist for 1907, bound in
two volumes, may be had on application to this office.   The 1907 volumes
are bound in the same style as the preceding years.

"The official printed proceedings of the Norfolk convention of the A. F.
of L. are now ready and can be had upon application by mail, 25 cents
per single copy, $20 per hundred.   Postage prepaid by the A. F. of L."

The said proceedings of the Norfolk convention contain, at page 91, the
name of petitioner as being on the "Unfair" list of the American Federa-
tion of Labor.

Notwithstanding the fact that the injunction *pendente lite* had taken
effect on the 23d day of December, A. D. 1907, the said Samuel Gompers
and the said Frank Morrison thereafter continued to circulate and dis-
tribute the said issue, containing the name of petitioner as aforesaid, and
notwithstanding the fact that the permanent injunction has since been
entered in this cause, they have, from the said 23d day of December, A. D.
1907, to the present time, continued, uninterruptedly, to circulate and
distribute to the public generally copies of the said January, 1908, number

to it was being rendered of no avail to it by reason of the alleged wilful violations of the injunction order and decree by the appellants.   It appealed to the equity court, which had passed the injunction order and decree, to give effect to them by compelling, through the coercive process of contempt proceedings, obedience to the order and decree.   If this be the true character

of the American Federationist, of the proceedings of the Norfolk convention above mentioned, and bound copies of the American Federationist for the year 1907, the latter containing, in each of the May, June, July, August, September, October, November, and December numbers thereof, the name of petitioner on the "We Don't Patronize" or "Unfair" list of the American Federation of Labor; all in violation and wilful disregard and contempt of the injunctive order and decree of the court in this cause.

### XVII.

Thereafter, to wit: in the February, 1908, number of the American Federationist, the said Samuel Gompers, in the editorial column thereof, under his own name, published a lengthy article concerning the said order, at pages 98 to 105, inclusive, and the said Samuel Gompers, Frank Morrison, and John Mitchell published, at pages 112 and 113 of the said number of the American Federationist, what they denominated an "Urgent Appeal," signed by the defendant Samuel Gompers, as president, the defendant Frank Morrison, as secretary, and the defendants James Duncan, John Mitchell, James O'Connell, Max Morris, D. A. Hayes, Daniel J. Keefe, William D. Huber, Joseph F. Valentine, as vice presidents, and the defendant John B. Lennon, as treasurer, composing the executive council of the American Federation of Labor, in which they made special reference to said editorial article as containing a full presentation of the said defendants' position in regard to said order of injunction. In the course of both the said editorial and the said "Urgent Appeal," it was stated that the order is an invasion of the liberty of the press and the right of free speech, and further stated in said editorial that, "with all due respect to the court, it is impossible for us to see how we can comply with all the terms of this injunction," and further stated in said editorial as follows:

"This injunction cannot compel union men or their friends to buy the Buck's stoves and ranges. For this reason, the injunction will fail to bolster up the business of this firm, which it claims is so swiftly declining.

"Individuals, as members of organized labor, will still exercise the right to buy or not to buy the Buck's stoves and ranges. It is an exem-

of the contempt proceedings, they were merely a part of the
relief sought in an equity cause, and the order and judgment in-
flicting the punishment for contempt being final, it will be re-
viewed in this court, as any other final decree in equity, by an
appeal taken in the ordinary way, and this means bringing up
the whole record upon which the decree or order appealed from
is based, which, in this case, is the petition for the rule to show

---

plification of the saying that 'you can lead a horse to water, but you
can't make him drink;' and more than likely these men of organized labor
and their friends will continue to exercise their right to purchase or not
purchase the Buck's stoves and ranges.

"It may not be amiss here to say that, in all these proceedings, whether
before the court or in the contest forced upon labor by the Buck's Stove
& Range Company, no element of personal malice or ill-will enters. Labor
is earnestly desirous of entering into friendly relations with employers,
and this is none the less true of its desire to reach an honorable adjust-
ment and agreement with the Buck's Stove & Range Company. So long,
however, as that company continues in its hostile attitude to labor, deny-
ing it the right to organize, discriminates against union members, and
refuses to accord conditions of employment generally regarded as fair in
the trade, it must expect retaliatory measures; these measures always,
however, within the law, and for the purpose of ultimately reaching an
honorable, mutually advantageous agreement.

"The publication of the Buck's Stove & Range Company on the 'We
Don't Patronize' list of the American Federation of Labor is only an
incident in the history of the case. These stoves might have been left
severely alone by purchasers if they had never been mentioned on that
list. It is not the matter of removing that firm from the list against
which we primarily protest, it is this injunction invading the freedom of
the press."

And, at pages 114 and 115 of the said February, 1908, number of the
American Federationist, the said Samuel Gompers published the order
itself at length, prefacing the same with the following statement:

"In the official organ of the National Association of Manufacturers, one
of the counsel for the Buck's Stove & Range Company declares that pun-
ishment for violation of the injunction issued by Justice Gould against
the American Federation of Labor applies particularly to those within
the territorial limits of the District of Columbia, who violate the terms of
the injunction. That those who violate the terms of the injunction in
any other part of the country outside of the District of Columbia can
be punished only when they thereafter come within the territorial limits

cause why an attachment for contempt should not issue, and for general relief, the answers thereto, the evidence taken by the petitioner in support of the allegations of its petition, the opinion of the court, and its order and decree thereon.   It requires no bill of exceptions, agreed case, or the equivalent.

The petitioner, in its motion to dismiss, realizes that it must make it appear that the contempt proceeding is a common-law

---

of the District of Columbia.   Counsel for the American Federation of Labor assure us that this construction of the court's order is accurate."

Petitioner is advised and believes, and therefore avers, that the said statement prefacing the publication of the order of December 18, 1907, is an incorrect interpretation of the effect of the said order, and was made for the purpose of defeating, and of inducing others to violate, the same; and that the publication of the said order, prefaced as aforesaid, and of the said editorial, constituted a violation of the injunction *pendente lite* and a contempt of the order of the court.   A copy of the said February, 1908, number of the American Federationist is herewith filed, marked exhibit petitioner No. 1, and it is prayed that the said editorial, the said "Urgent Appeal," and the references on pages 114 and 115 thereof to the said order, be taken and read as a part of this petition.

### XVIII.

The said John Mitchell, as set out in paragraph 4 of the original bill in this cause, is a vice president and a member of the executive council of the defendant American Federation of Labor.   Until the 1st day of April, A. D. 1908, and for many years prior thereto, he was also the president of the United Mine Workers of America, one of the subordinate national and international unions of the defendant American Federation of Labor, referred to in paragraph 4 of the original bill in this cause, and in exhibit C, thereto attached, and the chairman of its executive board, by which executive board is published weekly the United Mine Workers' Journal, the official organ of the said United Mine Workers of America.   In the issue of the said United Mine Workers' Journal of January 30, 1908, the said John Mitchell caused or permitted to be published the above-mentioned editorial "Urgent Appeal" and statement prefacing the said injunction order, as published in the February, 1908, number of the American Federationist, as will be seen by reference to pages 6, 15, and 16 of the said issue of January 30, 1908, a copy of which is herewith filed, marked exhibit petitioner No. 2, and prayed to be taken and read as a part of this petition.   The said United Mine Workers of America comprise several hundred thousand members, and its official

proceeding, and that therefore the order or decree of the court below adjudging the appellants in contempt is reviewable by writ of error only, and not by appeal, this being the first stated cause of its motion to dismiss, although later in the petitioner's brief it is said that "it is, of course, not contended that an actual writ of error is necessary to bring a law cause from the lower

organ is circulated generally among the members of the said association, and the public at large.

On to wit: the 25th day of January, A. D. 1908, at the Nineteenth Annual Convention of the United Mine Workers of America, held at Indianapolis, Indiana, the defendant John Mitchell, its president, being in the chair, the following resolution was laid before the convention by the said defendant John Mitchell, put to a vote, and adopted unanimously, and by him so declared:

### Resolution No. 73.

Whereas, the Buck's Stove & Range Company, of St. Louis, Missouri, have taken legal steps to prevent organized labor in general, and the officers and executive committee of the A. F. of L., in particular, from advertising the above-named firm as being on the "Unfair" or "We Don't Patronize" list, and

Whereas, by the issue of such an injunction or restraining order, as prayed for by above named firm, organized labor will be deprived of one of its most effective weapons, and

Whereas, J. W. Van Cleave, the president of above-named firm, also president of the National Manufacturers' Association, stated that, in a few years' time, he would disrupt organized labor; therefore, be it

Resolved that the U. M. W. of A., in Nineteenth Annual Convention assembled, place the Buck's stoves and ranges on the unfair list, and any member of the U. M. W. of A. purchasing a stove of above make be fined $5, and, failing to pay the same, be expelled from the organization.

And, thereafter, to wit: the 30th day of January, A. D. 1908, the said John Mitchell caused or permitted the official report of the proceedings of the said convention to be published in the above-mentioned issue of the said United Mine Workers' Journal, including the said resolution and the action taken thereupon, as will be seen by reference to page 7 of exhibit petitioner No. 2, above referred to.

And the said John Mitchell also caused or permitted the following to be published on the front page of the issue of the said United Mine Workers' Journal of the 9th day of January, A. D. 1908, as will be seen

court to this court for review." We have endeavored to show that this is a mistaken application of the rule in certain classes of contempt proceedings, which are treated as proceedings at common law, and, if we have succeeded in doing this, it seems to us that it settles the question raised by the motion, and the same must be overruled.

---

by reference to a copy of said issue herewith filed, marked exhibit petitioner No. 3, and prayed to be taken and read as a part of this petition:

### Unlawful Boycott.

Our readers should govern themselves accordingly and allow all to live unmolested.

Here is something clever and cute from the Galesburg Labor News:

"Whether or not the Manufacturers' Association, who were behind the Buck Stove & Range Company in instigating the suit, will accomplish their desired results, is difficult to say. Trades unionists will fail to see wherein they will. For no power on earth can compel a man to buy something he does not want to, and an announcement something on this order is enough to indicate to a union man what not to buy:

"It is unlawful for the American Federation of Labor to Boycott Buck Stoves and Ranges.

"Justice Gould, in the equity court of the District of Columbia, on December 17th, handed down a decision granting the company a temporary injunction preventing the Federation from publishing this firm as

### Unfair to Organized Labor.

"The above could hardly be construed to conflict with the law, since it is a statement of facts."

A funny thing about this case is that the boycott has been on this firm for more than a year. Now, the unions have their attention directed to it for fair.

And the peculiar arrangement of type in the said article, whereby particular display is given to the words "Boycott Buck Stoves and Ranges" and "Unfair to Organized Labor," without making these direct statements in the context of the article published, was devised and designed for the express purpose of violating the injunction of this court, whereby the publication of these statements is forbidden, and of causing the said publication to be reprinted and distributed and scattered broadcast throughout the land.

The said publication in the January 9, 1908, issue of the United Mine

It may be contended by the appellee that, in order to give to a contempt proceeding the remedial character which we insist characterizes the present contempt proceedings, it must appear that the court below imposed a fine, payable in whole or in part to the complainant and petitioner, as in the nature of damages for injuries suffered by it by reason of the alleged

---

Workers' Journal was taken up and followed by the labor press, as it was intended to be, and was extensively reprinted, and circulated broadly, throughout the country, including the Cleveland Citizen, of Cleveland, Ohio, published by the United Trades and Labor Council of that City, in its issue of January 18, 1908; the Labor Journal, the official organ of the New York Allied Printing Trades Council and of the Central Trades and Labor Council, published at Rochester, New York, in its issue of January 10, 1908; the St. Louis Labor, published at St. Louis, Missouri, in its issue of January 18, 1908, and in its weekly issues from then to the present time, and the Springfield Tradesman, published at Springfield, Missouri, in its issue of January 18, 1908; all as will be seen by reference to the deposition of the said Samuel Gompers, on file and of record in this cause, and the exhibits herewith filed, to all of which reference is hereby made.

### XIX.

Thereafter, to wit, in the March, 1908, number of the American Federationist, the said Samuel Gompers, in the editorial column thereof, at page 192, in pursuance of his plan to nullify the said order of the court in this cause passed, to disregard and disobey the same, to injure and interfere with the petitioner's business and the sale of its product by means forbidden in the said order, and to induce the members of the American Federation of Labor, and the public, not to patronize the petitioner, or buy its product, and to keep the boycott against the petitioner constantly in mind, and to maintain the same, though forbidden to do so by the said order, published the following statement:

"It should be borne in mind that there is no law, aye, not even a court decision, compelling union men or their friends of labor to buy a Buck's stove or range. No, not even to buy a Loewe hat."

### XX.

And, for the like purpose, the said Samuel Gompers and the said Frank Morrison published, in the April, 1908, number of the American Federationist, the statements hereafter referred to; the final decree in this cause granting a permanent injunction against the defendants, the said Samuel

violations of the injunction order and decree. While some of the cases cited by the petitioner are cases in which fine, and not imprisonment, was the punishment inflicted, that fact by no means justifies the contention that may be urged by the petitioner in this connection. The supreme court of the District

---

Gompers and Frank Morrison included, having been entered on the 23d day of March, A. D. 1908, and prior to the publication of the said April, 1908, number.

In the editorial column thereof, under his own name, the said Samuel Gompers published, at page 279, the following:

"The temporary injunction issued by Justice Gould, of the court of equity, of the District of Columbia, in the (Van Cleave) Buck's Stove & Range Company of St. Louis against the American Federation of Labor, its officers and all others, has been made permanent. The case will now be carried to the court of appeals of the District of Columbia.

"It should be borne in mind that there is no law, aye, not even a court decision, compelling union men or their friends of labor to buy a Buck's stove or range. No, not even to buy a Loewe hat."

And in the official column of the said issue, at page 295, over their signatures, in an official letter addressed to state branches and central bodies, the said Samuel Gompers and Frank Morrison published the following statement:

"Bear in mind that an injunction issued by a court in no way compels labor or labor's friends to buy the product of the Van Cleave Buck's Stove & Range Company of St. Louis.

"Fellow workers, be true and helpful to yourselves and to each other. Remember that united effort in cause of right and just must triumph."

### XXI.

Thereafter, to wit, on the 19th day of April, A. D. 1908, in the course of a public address to a large gathering of working people in the city of New York, the said Samuel Gompers, for the like purpose, made the following statement:

"They tell us that we must not boycott. Well, if the boycott is illegal, we won't boycott. But I have no knowledge that any law has been passed or any order issued by any court compelling us to buy, for instance, a range or a stove from the Buck's Stove & Range Company. You know that myself and several others are enjoined from telling you, and we are not prepared to tell you, that the Buck's Stove & Range Company is unfair. There are a number of men who have been having suit brought against them for $240,000. That is not very much, between you and me; but a

cannot, in punishing for contempt, impose both a fine and imprisonment (*Moss* v. *United States,* 23 App. D. C. 475). It may do either, and in this case it may well be assumed that the court below determined that the most effective way for administering relief to the complainant and petitioner was by imprisoning the appellants rather than by finding them. However

few hatters in Danbury, Connecticut, are being sued for saying that Loewe & Company, hat manufacturers, of Danbury, Connecticut, are unfair. I am not prepared to say that this is in violation—that they are unfair.

"Of course, in the case of the Buck's Stove & Range Company, if I told you that the Buck's Stove & Range Company was still unfair, when I got back to Washington to-morrow, or some place where they say people play checkers with their noses—well, as I say, I am not prepared to tell you that these things are unfair. But there is no law, no court decision that compels you to buy them, nor does any law compel you to buy anything without the union label.

"But boycotting, I think—I am sure that the term itself has been coined within my lifetime. Boycotting, in its essence and effect and practice, has been in vogue since man began. I do not care what conception you may have of the beginning of human existence. I still assert that the word 'boycott' had its origin from the beginning of man's life. Of course, it was not known as the boycott.

"The term 'boycott' originated in Ireland about twenty-five years ago, when the people of the Green Isle were up in protest against British misrule, and they adopted a plan against a certain agent for one of the landowners. This agent was known by the name of Captain Boycott. They did not say they were going to boycott him, but they simply said, in the language of the time, that they were going to send —— to Coventry. Coventry was not an attractive country place, so that after the action had been accomplished in regard to this gentleman, the term, instead of sending anyone to Coventry, was changed to boycotting him! in other words, it was either an implied understanding or an expressed declaration that the people would have no dealings with him insofar as it was possible. And then came the word 'boycott,' and it has come into our dictionaries and into our lexigraphs, as well as into our court decisions. Now, my friends, I do not think that what it is human to do, what it is human and humane to do, can be, by any species of misinterpretation, expected to be an illegal or improper act. You cannot make me buy anything I do not want to buy. I can tell my friends to do likewise, and they have a right to do what I have a lawful right to do and I have a

this may be, it is not the form of punishment inflicted for contempt that determines whether it is exercised for remedial purposes and in the interest of the party complaining of the violations of the orders or decrees of the court, or for purely punitive purposes. It is to be determined by looking at the nature and purpose of the suit in which a decree, judgment, or

---

legal right to tell them to do. No man has a vested right in my patronage. I have a right to bestow; I have a right to withhold and transfer it to anyone else, and I want to say this about that, injunction or no injunction, I won't buy a Loewe hat nor a Buck's stove or range."

And the said Samuel Gompers made the foregoing remarks in pursuance of his plan of violating, disregarding, and disobeying the said order of the court, and keeping the boycott against this petitioner in the minds of the members of the American Federation of Labor and of the public, and for the purpose of urging and encouraging the enforcement of the said boycott against the petitioner, of deterring dealers from buying petitioner's product or offering the same for sale, and of ruining and destroying its business.

### XXII.

And, in pursuance of his said plan, and for the like purpose, thereafter, in the editorial column of the May, 1908, number of the American Federationist, under his own name, at page 383, the said Samuel Gompers published the following statement:

"I want to assure you on my word of honor that, so long as I live, I will never buy a Loewe hat or a Buck's stove or range until these gentlemen come into agreement with organized labor and grant us conditions of fairness. Then they will get support and help. Until then, you may call it by any other name,—boycott or no boycott,—but I won't buy your hats anyhow."

### XXIII.

And, in further pursuance of his said plan, and for the like purpose, the said Samuel Gompers, in a public address delivered before a large gathering of working people on to wit: the first day of May, A. D. 1908, in the city of Chicago, Illinois, made the following statement:

"I might say just parenthetically about the hatters' case that you are not now permitted to boycott the Loewe hats, but I want to call your attention to the fact that there is no law compelling you to wear a Loewe hat, nor has any judge issued a mandamus compelling you to buy a Loewe

order alleged to have been violated is entered, and the purpose and object of the proceedings which called into exercise the contempt process of the court, and, tested in this manner, we repeat that it is plain that, in this case, the exercise of the contempt process was exclusively remedial and in the interest alone of the petitioner, the appellee.

It should not be lost sight of that most of the decisions relied

---

hat. That applies equally to Mr. Van Cleave's stoves and ranges. And, by the way, I don't know why you should buy any of that sort of stuff. I won't; but that is a matter to which we can refer more particularly in our organizations."

And thereafter, for the purpose of more widely disseminating the said statement, the said Samuel Gompers published the same in the June, 1908, number of the American Federationist, at pages 467 and 468 thereof.

### XXIV.

And, for the purpose of more effectually carrying out his said plan, and for the like purpose, the said Samuel Gompers, thereafter, in the editorial column of the July, 1908, number of the American Federationist, at page 531 thereof, under his own name, published the following statement:

"The supreme court of the District of Columbia has made permanent the injunction issued by Justice Gould, enjoining the American Federation of Labor, its officers, its affiliated unions, and their members and friends from declaring that the Van Cleave Buck Stove & Range Company of St. Louis is on the unfair list of the American Federation of Labor, or the publication of that statement in the American Federationist. An appeal will be taken to the court of appeals of the District of Columbia, and, if necessary, to the United States Supreme Court. The injunction does not compel anyone to buy the Van Cleave Buck stoves and ranges, nor has any decree been issued compelling anyone to buy Loewe's hats."

### XXV.

Each and every of the issues of the American Federationist in this petition mentioned has been circulated and distributed, in large numbers, by the defendant Frank Morrison, secretary of the defendant American Federation of Labor, and circulating and distributing agent of the American Federationist, and the said issues have been so distributed by him, in disregard and violation of the order and decree of the court in the premises, among the various subordinate unions of the defendant American Federation of Labor, as described in paragraph IV. of the original bill in this cause, and also to the public, and extensively read throughout the coun-

on by the petitioner in support of its motion are decisions based upon the statutes and practice which regulates the jurisdiction of the various Federal courts in reviewing cases coming up from the United States district and circuit courts to the appellate tribunals. The jurisdiction of this court, as a reviewing tribunal, does not depend upon nor is it derived from those statutes and that practice, but from the act of Congress creating this

try; and the said Frank Morrison, in so doing, has been fully aware of the contents of the said publication, and prompted by the same purposes which controlled and influenced the defendant Samuel Gompers in preparing and delivering the writings and speeches so set out in the said issues of the American Federationist.

## XXVI.

Though the said Samuel Gompers, Frank Morrison, John Mitchell, and the other defendants to the original bill, their and each of their agents, servants, attorneys, confederates, and any and all persons acting in aid of or in conjunction with them or any of them, are, by the order of this court of December 18, 1907, restrained and enjoined pending litigation, and by the order of March 23d, 1908, perpetually restrained and enjoined from conspiring, agreeing, or combining in any manner to restrain, obstruct, or destroy the business of the complainant, or to prevent the complainant from carrying on the same without interference from them or any of them, and from interfering in any manner with the sale of the product of the complainant's factory or business by defendants, or by any other person, firm, or corporation, and from declaring or threatening any boycott against the complainant, or its business, or the product of its factory, or against any person, firm, or corporation engaged in handling or selling the said product, and from abetting, aiding, or assisting in any such boycott, and from printing, issuing, publishing, or distributing through the mails, or in any other manner, any copies or copy of the American Federationist, or any other printed or written newspapers, magazine, circular, letter, or other document or instrument whatsoever, which shall contain, or in any manner refer to, the name of the complainant, its business or its product, in the "We Don't Patronize" or the "Unfair" list of the defendants, or any of them, their agents, servants, attorneys, confederates, or other person or persons acting in aid of or in conjunction with them, or which contains any reference to the complainant, its business or product, in connection with the term "Unfair," or with the "We Don't Patronize" list, or with any other phrase, word, or words of similar import, and from publishing or otherwise circulating, whether in

court and its rules promulgated under the authority of the creating statute. Looking at that statute and the acts of Congress amendatory thereof, and the rules of this court, it will be seen that a writ of error is the mode of securing a review by this court only of the judgments of the police and juvenile courts; that, in all other cases, a review is accomplished by an appeal, and the mode of prosecuting the appeal depends in turn upon what court below the case comes from, whether an equity court

---

writing or orally, any statement, or notice, of any kind or character whatsoever, calling attention to the complainant's customers, or of dealers or tradesmen, or the public, to any boycott against the complainant, its business or its product, or that the same are, or were, or have been declared to be "unfair," or that it should not be purchased or dealt in or handled by any dealer, tradesman, or other person whomsoever, or by the public, or any representation or statement of like effect or import, for the purpose of, or tending to, any injury to or interference with the complainant's business, or with the free and unrestricted sale of its product, or of coercing or inducing any dealer, person, firm, or corporation, or the public, not to purchase, use, buy, trade in, deal in, or have in possession stoves, ranges, heating apparatus, or other product of the complainant, and from threatening or intimidating any person or persons whomsoever from buying, selling, or otherwise dealing in the complainant's product, either directly, or through orders, directions or suggestions to committees, associations, officers, agents, or others, for the performance of any such acts or threats as hereinabove specified, and from in any manner whatsoever impeding, obstructing, interfering with, or restraining the complainant's business, trade, or commerce, whether in the State of Missouri, or in other States and Territories of the United States, or elsewhere wheresoever, and from soliciting, directing, aiding, assisting, or abetting any person or persons, company or corporation to do or cause to be done any of the acts or things aforesaid; yet, by the acts, means, devices, and subterfuges aforesaid, the said Samuel Gompers, Frank Morrison, and John Mitchell have designed and sought to continue in force and effect, and have continued in force and effect, in wilful disregard, violation, disobedience, and contempt of the aforesaid order and decree of this court, the boycott against petitioner, and the conspiracy recited in the bill to destroy its business, which they and the other defendants have been and are, by the said order and decree, restrained and enjoined from continuing:

Wherefore, petitioner prays as follows:

(1) That a rule be laid upon the said Samuel Gompers, Frank Mor-

or a common-law court.  If the latter, then there must be a bill of exceptions or such equivalent of that as is recognized by well-established practice; but not so in the case of appeals from the equity court which bring up for review the whole record, and this tribunal in such cases reviews both the facts and the law.  There is no rule of this court that prescribes the method of prosecuting an appeal from the equity court from an order or decree adjudging a person in contempt, and the precedents

---

rison, and John Mitchell, requiring each of them to show cause, at a time to be fixed by the court in said rule, why the writ of attachment should not issue against him, and why he should not be adjudged by the court to be in contempt of its order and its decree in this cause, and be punished for the same.

(2) And that petitioner may have such other and further relief as the nature of its case may require.

[Seal.]                    The Buck's Stove & Range Company,
                    By J. W. Van Cleave, President.

Attest:
    P. A. Samplin,
            Ass't Sec'y.
    W. C. Sullivan,
    Daniel Davenport,
    James M. Beck,
    J. J. Darlington,
            Solicitors.


State of Missouri,
    City of St. Louis, ss:


I, James W. Van Cleave, on oath say that I am president of the Buck's Stove & Range Company, the petitioner named in the foregoing and annexed petition, whose name I have subscribed and whose seal I have affixed thereto in my said capacity, in which capacity I make this affidavit; that I have read the said petition and know the contents thereof; that the allegations therein set forth upon personal knowledge are true, and that those set forth upon information and belief, I believe to be true.
                    James W. Van Cleave.
    Subscribed and sworn to before me, this 17th day of July, A. D. 1908.
    [Seal.]                    C. C. Crone,
                    Notary Public, City of St. Louis.
My term expires July 6, 1909.

that are available have been observed in the present appeal.    We find two such precedents among the reported decisions of this court.    They are *Drew* v. *Hogan,* 26 App. D. C. 55; *Lane* v. *Lane,* 27 App. D. C. 171.

Among the cases reviewed in the *Bessette Case* was that of *New Orleans* v. *New York Mail S. S. Co.* 20 Wall. 387.    The mayor of New Orleans had been adjudged in contempt for something he had done before becoming a party to the action, and in this, as in many of the cases cited by the appellees on the motion to dismiss, the judgment in contempt against him was treated as a specific criminal offense.    In fact, in the principal case, Bessette, whose action was treated as a contempt and who was compelled to resort to a writ of error, was not a party to the original action, and otherwise not within the original remedial jurisdiction of the court, and, being outside it, his action was regarded as criminal.

To the contrary, in the case of *Hayes* v. *Fischer,* 102 U. S. 95, cited by Mr. Justice Brewer, an interlocutory injunction having been granted and the defendant fined for contempt for violation thereof, the fine to be paid to the plaintiff in reimbursement, Mr. Justice Waite said: "This order, if part of the proceedings in the suit, was interlocutory only.    If the proceeding below, being for contempt, was independent of and separate from the original suit, it cannot be re-examined here, either by writ of error or appeal."    (The law relative to appeals has since been changed.)

In *Warden* v. *Searls,* 121 U. S. 14, defendants, having been adjudged guilty of contempt for violating the order of the court, and being parties to the action, and further charged with the costs of the contempt proceeding, and the court finding that the decree in favor of plaintiff was erroneous, dismissed the appeal and set aside the order imposing the fines, treating such order as interlocutory and pertaining to the main cause.

*O'Neal* v. *United States,* 190 U. S. 36, was that of an assault upon a trustee in bankruptcy, and the judgment was found to be a judgment in a criminal case, over which the Supreme

Court had no jurisdiction. This is so clearly distinguishable from the present case it will not require discussion.

Referring to the matter of the petitioner of the Christensen Engineering Company for writ of mandamus, 194 U. S. 458, wherein the Supreme Court, through Mr. Justice Fuller, pointed out clearly that, in the *Bessette* and *New Orleans* v. *New York Mail S. S. Co.* Cases the acts were committed by one not then a party to the suit, and were purely of a criminal nature, whereas the opposite was the case in *Hayes* v. *Fischer* and *Warden* v. *Searls.*

In *Continental Gin Co.* v. *Murray Co.* 162 Fed. 873, the plaintiffs in error, who were not parties to the injunction, but had knowledge of it, were adjudged in contempt, ordered to pay a fine to the United States, a sum to the complainants as counsel fee, and the costs of the proceeding; and in that case Mr. Justice Moody objected to its hearing because, although a writ of error was sued out, "there was no finding of facts, nothing in the nature of a special verdict, no request for a ruling upon the facts, nor upon any question of law, and no bill of exceptions." For the reasons that we have pointed out, this case is no precedent for the case at bar.

In the case at bar we have to bear in mind that the parties charged with contempt are among those against whom the original remedial relief was sought, and the contempt proceedings are therefore in the line of the original action.

When one bears in mind that, in point of fact, the errors are upon the face of the record, we alleging substantially no errors that do not clearly appear upon the face of the pleadings and the decree of the court, the decree adjudging the appellants in contempt for having committed the acts alleged in the petition (paragraph 26 of the petition, said by the court to constitute the basis of its judgment, reincorporating all allegations of the petition), and these being the clear basis of its action, we submit that, even were this a law case, this court has before it everything that could be given by the most ample bill of exceptions. Clear and decisive propositions of law are placed before us by the action of the court below itself.

## On the Merits.

1. The court erred in condemning the respondents to terms of imprisonment of twelve, nine, and six months, each and every of such terms of imprisonment being so excessive as to constitute want of due exercise of judicial discretion.

In all the history of contempt proceedings, so far as disclosed by the reports and within the knowledge of appellants' counsel, no case exists where, for offenses in the slightest comparable with those alleged to have been committed by the appellants, such an extraordinary punishment has been meted out. In our view, the whole purpose and intent upon which the court acts in injunction and contempt proceedings has been lost sight of, and the equity court has undertaken to act as might have been permitted to a judge and jury when an examination had been made under all the protection given a defendant by the rules pertaining to criminal law. See the language used by Mr. Justice Taft in *Thomas* v. *Cincinnati,* 62 Fed. 823.

The heaviest sentences ever imposed within our knowledge for contempt were inflicted by Judge Taft upon Phelan in the case last referred to, and by Judge Woods in the *Debbs Case* (64 Fed. 724), six months being the term of imprisonment inflicted.

Next in length of time is that of four months to Orr, in *United States* v. *Kane,* 23 Fed. 748, in which a large number of strikers had assumed to stop the operations of a railroad in the hands of receivers; tried to prevent the engineers from running out the trains, and to prevent the train men from working, the particular respondent having indulged in threats of a grave character. Others concerned in the same affair were given, by Judge Brewer, thirty and ten days in jail.

The only other case of which we have knowledge in which as severe punishment has been given by Federal courts is that of *Secor* v. *T., P. & W. R. R. Co.* Fed. Cas. No. 12,605, wherein Drummond, circuit judge, sentenced to jail for four months the leader of a mob which had taken possession of and prevented the running of trains, belonging to a railroad at the time in the hands of a receiver.

Other Federal cases have usually provided for imprisonment from ten to thirty days.

Of great weight in determining the character of the punishment inflicted in this case, as to whether within the bounds of just legal discretion or not, are the legislative expressions of opinion as contained in the statutes of many of the states of the Union, in no one of which are the courts allowed to imprison for contempt for a term exceeding six months, and in some in which they are not allowed to go beyond five or ten days.

Thus, in Florida fines for contempt may not exceed ten days or imprisonment thirty days (*Ex parte Edwards,* 11 Fla. 174).

In Louisiana, fines are limited to $50 and imprisonment to ten days (*State* v. *Keene,* 11 La. 596.)

In New York, fines may not exceed $250 and imprisonment not in excess of six months (*King* v. *Barnes,* 113 N. Y. 476).

In North Carolina, the punishment is a fine not exceeding $250, or imprisonment not exceeding thirty days (*Re Patterson,* 99 N. C. 418.)

In Ohio, punishment may not be more than a fine not exceeding $500 and imprisonment not exceeding ten days (*Myers* v. *State,* 46 Ohio St. 473).

In Tennessee, fines are limited to $50 and imprisonment must not exceed ten days (*State* v. *Rust,* 2 Tenn. Ch. 181).

In Michigan, fines may not exceed $250, nor imprisonment thirty days (*Sloman* v. *Reilly,* 95 Mich. 264).

In Georgia, by sec. 242, subparagraph 5, punishment is limited to twenty days' imprisonment.

In California, by the practice act, secs. 488, 489, punishment may not exceed $500 and imprisonment not exceeding five days (*Galland* v. *Galland,* 44 Cal. 475).

In Texas, in 1889, before justice of the peace, punishment may not exceed $25, or the imprisonment one day (*Ex parte Robertson,* 27 Texas App. 628).

In Wisconsin, by the Revised Statutes of 1858, chapter 149, sec. 25, not more than six months' imprisonment is permitted (*Re Pierce,* 44 Wis. 411).

In North Carolina, *Re Patterson,* 99 N. C. 418, the court, finding punishment excessive, reversed the case.

In *De Beukalaer* v. *People,* 25 Ill. App. 460, the court,

holding that a fine of $500 and imprisonment for thirty days for removing birthmark on a child was an unusual and immoderate punishment, the conviction was reversed and the cause remanded.

2. The court erred in finding that the defendants Gompers and Morrison were, in any degree, responsible for contempt because of the fact, as found, that they had rushed the publication and circulation of the Federationist of January, 1908, before the approval of the injunction bond.

No punishment can be had for the contempt of an ineffective order, neither. can an order be made to operate retroactively. The first of these suggestions, as well as the second, is borne out by the language of *Drew* v. *Hogan,* 26 App. D. C. 61, the case of *Lamon* v. *McKee,* 18 D. C. 447, also showing that there could be no contempt where the decree was without authority for want of jurisdiction, and, as was held in the first-cited of these cases, no preliminary injunction order could be made without the prior filing of a bond, such requirement being jurisdictional.

3. The court erred in finding that the letter of November 26, 1907, had any connection with the alleged subsequent violations of the injunction.

There is no scintilla of evidence in the entire record connecting this publication with any boycott, legal or illegal, of the Buck's Stove & Range Company's products occurring after the injunction became effective. It is left only to the imagination to find a connection, as to which no proof exists, and a conviction of an offense quasi-criminal in its nature may assuredly not be sustained in any such manner.

4. The court erred in finding that the various speeches, communications, books, etc., made and published by the several defendants before the injunction became effective, had any connection with the alleged violations of the injunction.

5. The court erred in finding that any sentiment expressed by any of the defendants prior to the date of the injunction, and in opposition to an injunction which, as it appears from the

decision of the court of appeals, the court below had no right to pass, could afford a foundation for assuming prior intent to disobey any lawful process of the court.

6. The court erred in finding that the defendants were guilty of contempt in the circulation of bound copies of the Federationist for 1907, of occasional copies of the Federationist of January, 1908, and of the proceedings of the Convention of November, 1907, none of the same having been circulated for the purpose of furthering any alleged boycott.

7. The court erred in finding that the defendants violated the injunction by the issuance of the "Urgent Appeal" of January 24, 1908, and of the editorial in connection therewith, the same having been proper and necessary steps in their own defense, and not in furtherance of any boycott.

There is nothing in either the editorial or in the appeal itself calling for a boycott of any kind, except it be that a refusal of intercourse on the part of respondents and their friends with the complainant in this case constitutes such boycott as a court shall take within its cognizance, and no appeal for or suggestion of any other kind of boycott or procedure is at any time made.

8. The court erred in finding that, in the various editorials, editorial notes, and comments published by the defendant Samuel Gompers, and circulated by the defendant Frank Morrison, there was any intent other than free discussion and interpretation of the action of the court below, and in finding that they were violations of the injunction.

9. The court erred in finding any intent on the part of the defendant John Mitchell to violate the injunction in presiding over a meeting of the United Mine Workers of America, or in anything alleged against him in paragraph 18 of the petition.

10. The court erred in finding the defendant Gompers guilty of contempt in having referred to the Buck's Stove & Range Company and the boycott upon its products in speeches made after the date of the filing of the petition in contempt.

11. The court erred in adjudging contempt as to the void

part of decrees, such void part prohibiting freedom of speech and of the press whether for an illegal purpose or not.

12. The court erred in finding that, after the date of the decree or injunction signed by Judge Gould, any of the defendants had taken any step whatever in the prosecution of the illegal boycott.

13. The court erred in enforcing an injunction void in that it forbade freedom of speech and of the press by forbidding the fair discussion of the terms and meaning of the injunction itself.

The court of appeals has already decided that the decrees of Justices Gould and Clabaugh were erroneous, and that, in addition to material elisions, such parts as remain should be qualified by the use of the words "in furtherance of any boycott."

The old decrees enjoined the respondents "from printing, issuing, publishing, or distributing through the mails or in any other manner any copies or copy of the American Federationist or any other printed or written newspaper, magazine, circular, letter, or other document or instrument whatsoever which shall contain or in any manner refer to the name of the complainant, to its business or its product, in the 'We Don't Patronize' or the 'Unfair' list of the defendants, or any of them, their agents, servants, attorneys, confederates, or other person or persons acting in aid of or in conjunction with them, or which contains any reference to the complainant, its business or product, in connection with the term 'Unfair' or with the 'We Don't Patronize' list, or with any other phrase, word, or words of similar import, and from publishing or otherwise circulating, whether in writing or orally, any statement or notice of any kind or character whatsoever, calling attention to the complainant's customers or of dealers or tradesmen or the public to any boycott against the complainant, its business or its product, or that the same are or were or have been declared to be 'Unfair,' or that it should not be purchased or dealt in or handled by any dealer, tradesman, or other person whomsoever by the public or any representation or statement of like effect

or import for the purpose of or tending to any injury to or interference with the complainant's business, or with the free and unrestricted sale of its product, or the coercion or inducing any dealer, person, firm, or corporation, or the public not to purchase, use, buy, trade in, deal in, or have in possession, stoves, ranges, heating apparatus, or products of the complainant," etc.

We are justified by the opinions filed in the main case in submitting that in this order, so far as quoted, without the limitation prescribed by the court of appeals, there were mingled valid and invalid elements, for the most part, in fact, invalid, but, in so far as they tended to be valid, so bound up with the invalid as to render them incapable of disentanglement, and that, therefore, so much of the order as is quoted, as well as other parts of it, was void; that no punishment for contempt could be predicated upon it, and that the respondents, being condemned solely for violation of this part of the order, must be discharged.

It clearly appears from the opinion of Mr. Justice Robb that the order of the court below, in so far as it went beyond an injunction against an illegal boycott and against steps in furtherance of such boycott, was too broad.

That the grounds of its illegality were to be found in its violation of constitutional rights belonging to the respondents is more largely demonstrated by the opinion of Mr. Justice Van Orsdel.

We are brought, then, to the position that the decrees below in respect of publications or utterances—it is only with regard to them that the respondents have been held guilty—were in excess of the jurisdiction of the court, in that they violated constitutional rights,—those of freedom of speech and of the press.

A decree may be attacked collaterally as void when the court acts without jurisdiction over the person or of the subject-matter, or is without jurisdiction to make the particular order. The inquiry of Mr. Justice Shepard in the case of *Tolman* v. *Leonard,* 6 App. D. C. 232—"Had that court any jurisdiction in the premises at all? If so, did it clearly exceed

that jurisdiction in the way complained of ?"—must arise whenever the validity of any decree is called into question collaterally or directly. In the case referred to, the question arose collaterally on an application for habeas corpus. In the present case, it arises collaterally, the respondents challenging the validity of the decrees below when an attempt is made to give them efficacy.

The Supreme Court of the United States has many times said that the court below must have authority not only over the persons and the subject-matter, but to pass the particular decree rendered by it. This was the case, for instance, in *Ex parte Robinson,* 19 Wall. 505, where the sentence for contempt disbarring an attorney from practice was held void and he was restored to the rolls by a mandamus.

So, in *Ex parte Rowland,* 14 Otto, 604, it was said that "if the command of the writ against the commissioners was what the circuit court has construed it to be, it was in excess of the jurisdiction of the court, and consequently void. If the command of the writ was in excess of jurisdiction, so necessarily were the proceedings in contempt in not obeying. We are led, therefore, to the conclusion that the order of the court under which the marshal holds the petitioners in custody was a nullity, and that a writ of habeas corpus should issue as prayed for unless the parties are willing that an order of discharge shall be entered without further proceedings." .

In *Re Mills,* 135 U. S. 263, the court said: "The court below was without jurisdiction to pass any such sentences, and the orders directing the sentences of imprisonment to be executed in a penitentiary are void."

This is not a case of mere error, but one in which the court has transcended its powers.

In *Re Fisk,* 113 U. S. 713, the court had jurisdiction of the person and subject-matter, but made an order in excess of authority in directing an examination prior to trial, as provided by the New York State statutes, but against the United States Revised Statutes. The petitioner was, on habeas corpus, ordered to be discharged.

In *Re Ayres,* 123 U. S. 443, the case of *Ex parte Rowland* was recited approvingly to the effect that, "if the command was, in whole or in part, beyond the power of the court, the writ, or so much as was in excess of jurisdiction, was void, and the court had no right in law to punish for any contempt of its unauthorized requirements."

Such has been the rule adopted by the Supreme Court in many other cases, as, for instance, the cases of *Ex parte Lange,* 18 Wall. 163; *Ex parte Parks,* 93 U. S. 18; *Ex parte Siebold,* 100 U. S. 371; *Ex parte Virginia,* 100 U. S. 339; *Re Sawyer,* 124 U. S. 200; *Elliott* v. *Pearsol,* 1 Pet. 328.

Among the State or Federal cases enunciating the same doctrine are *People* v. *O'Neil,* 47 Cal. 109; *Lester* v. *People,* 150 Ill. 408 (holding an order void and refusing contempt predicated upon it because in violation of a constitutional provision); *Walton* v. *Develing,* 61 Ill. 201; *Dodd* v. *Una,* 40 N. J. Eq. 672; *Ex parte Gardner,* 22 Nev. 280; *Ex parte O'Brien,* 127 Mo. 477 (in which the court said that "a court may have authority to hear and determine a case, but its determination or judgment must be within the confines of the law, and such power does not authorize it, simply because it has jurisdiction to render some judgment in the cause, to trample down the prisoner's fundamental and constitutional rights by pronouncing a sentence unauthorized by law"); *State ex rel.* v. *Theard,* 48 La. Ann. 1448; *State* v. *District Court,* 21 Mont. 155, 69 Am. St. Rep. 645 (holding specifically that "a party cannot be guilty of contempt of court for disobeying an order which the court had no authority of law to make"); *Lewis* v. *Peck,* 154 Fed. 273; *State ex rel.* v. *Wear,* 33 L.R.A. 341; *Forrest* v. *Price,* 52 N. J. Eq. 16; *American Lighting Co.* v. *Public Service Corp.* 134 Fed. 129; *Koehler* v. *Dobberpuhl,* 56 Wis. 497.

The court of appeals, having demonstrated that the order of the court below in certain aspects was erroneous, and, furthermore, void, in that it violated the constitutional rights of the respondents, and the foregoing authorities having demonstrated that there can be no contempt involved in the disobedience of a void order, it remains only to see if the void

part of the decree, as affects matters under discussion, can be so disentangled from the valid part of the decree affecting the same subject that the respondents can be held in contempt for a violation of its terms; for we fully recognize the rule that where a statute or an order is in some respects void, as, for instance, unconstitutional, yet, nevertheless, a person may be held responsible for its violation, provided the invalid portion may be disentangled and excluded from the valid, and the person charged has, such disentanglement and exclusion having taken place, been guilty of its violation. In the present case any publication whatsoever involving the use of the name of the complainant or its products in connection with the "We Don't Patronize" list was, without qualification, declared unlawful. Had the qualification been contained in the decree it might have been that, as to publications "in furtherance of a boycott," the respondents could have been held in contempt; but where, before the constitutional protection can be removed, there must be used certain nonexisting qualifying words, can the respondents be charged with contempt? We respectfully and earnestly insist that they cannot.

The respondents are enjoined from printing, etc., any copies of the Federationist or any other printed or written newspaper containing or referring to the name of the complainant, its business or product, and from declaring that the same have been deemed unfair, or from making any other representation or statement of like effect or import for the purpose of or tending to injure or interfering with the complainant's business, or with the free or unrestricted sale of its product, or inducing any dealer, person, firm, or corporation not to purchase, etc., ranges, etc., the product of the complainant. They have referred to the complainant's name as having been on the unfair list, although they have not published such list since the injunction order became effective, and it may have been that the effect of such publication was to "induce persons from dealing with the complainant;" but, as the court of appeals has said through its several judges, they had a constitutional right to induce any of

their friends or sympathizers not to so deal with the complainant, such step not being taken in pursuance of a boycott. They have announced that they would not themselves buy such stoves, and that no court could compel them to make such purchase; and for the use of this language Mr. Justice Wright has sentenced them to jail for excessive periods, although the court of appeals, speaking by Mr. Justice Robb, has said: "We have no power to compel the defendants to purchase complainant's stoves." When they have made this announcement they have not accompanied it by "threats of boycott or other manner of intimidation against complainant's patrons or those handling or wishing to purchase its product" (Justice Robb's opinion).

The court below has construed a temperate appeal for financial assistance to prosecute an appeal as a contempt of the order of the court below. Could a constitutional right have possibly been treated with less respect? But was not Mr. Justice Wright, in finding contempt in the making of such appeal, justified by the text of the orders of his associate? Are not, therefore, orders so disregardful of constitutional rights of necessity absolutely void whenever invoked?

14. The court erred in finding that the respondents Gompers and Morrison were guilty of the several acts charged in the 16th and 20th paragraphs of the petition; that the defendants Samuel Gompers, Frank Morrison, and John Mitchell were guilty of the several acts charged in paragraphs 17 and 26 of the petition; that the respondent Morrison was guilty of acts charged in the 25th paragraph of the petition; and that the respondent Gompers was guilty of the several acts charged in the 19th, 21st, 22d, and 23d paragraphs thereof.

15. The court erred in finding that the respondents, Samuel Gompers, Frank Morrison, and John Mitchell, were guilty of contempt.

16. The court erred in adjudging that the several respondents should be imprisoned in jail for the terms specified in its decree.

*Mr. James M. Beck, Mr. Daniel Davenport,* and *Mr. J. J. Darlington* for the appellee.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

At the threshold of this inquiry, we are met with a motion filed by complainant to dismiss the appeal. This motion is based upon three grounds: First, that the judgment of the court below is reviewable by writ of error only, and not by appeal; second, that the record contains no bill of exceptions, agreed statement of facts, or other appropriate basis for review of the judgment in this court; and, third, that the appeal presents no case susceptible of review by this court upon the record therein.

No bill of exceptions has been preserved or appears in the record. The case was brought here by the defendants upon the theory that the judgment decreeing them guilty of contempt is in the nature of an interlocutory order made in the original injunction proceedings, and that the case should come here for review on appeal as part of the equitable proceeding. The motion, therefor, primarily raises the question whether this case can be reviewed upon appeal, or whether it should have come here on error. Section 226 of the Code, providing for appeals to this court, is as follows: "Any party aggrieved by any final order, judgment, or decree of the supreme court of the District of Columbia, or of any justice thereof, 'including any final order or judgment in any case heard on appeal from a justice of the peace,' may appeal therefrom to the said court of appeals; and upon such appeal the court of appeals shall review such order, judgment, or decree, and affirm, reverse, or modify the same, as shall be just." [31 Stat. at L. 1225, chap. 854.] This provision of the Code embraces appeals in cases both at law and in equity, but it in no way affects the character of record necessary to obtain a review in this court. The record in a law cause must still contain a bill of exceptions, or its equivalent, to bring before the court the evidence and rulings thereon of the court below. *Ormsby* v. *Webb,* 134 U. S. 47, 33 L. ed.

805, 10 Sup. Ct. Rep. 478; *Metropolitan R. Co.* v. *District of Columbia* (*Metropolitan R. Co.* v. *Macfarland*) 195 U. S. 322, 49 L. ed. 219, 25 Sup. Ct. Rep. 28. The record, therefore, essential to properly present a law cause for review in this court, must be the same as if the case were brought upon writ of error instead of appeal. That being true, the general rule as to the preparation of the record applicable to the appeal of contempt cases in Federal courts will apply to this court.

We are of the opinion that, under our practice, where the contempt is civil and the order adjudging contempt is made in the course of the original proceedings, the order may be treated as interlocutory, and may be considered as a part of such proceedings, and so treated, either upon the appeal of the original cause or upon a special appeal. Hence, if the contention of counsel for defendants is correct, the order being one made in the original injunction proceeding, if a civil contempt, would be appealable and reviewable in the same manner as the original cause.

The mere fact, however, that the alleged contempt was brought to the attention of the court by petition of the complainant, and not upon complaint of the prosecuting officer of the government, is immaterial in determining whether the process issued thereon is civil or criminal. We are not concerned with the manner in which the court's attention was called to the offense, but with the proceedings after the court took cognizance thereof.

Blackstone (bk. 4, chap. 20), considering the general subject of crimes, treats contempt of court under the head of "summary convictions." The only distinction he makes between contempts and other misdemeanors is in the manner in which they are prosecuted. Enumerating the different species of contempt, he refers to "those committed by parties to any suit or proceeding before the court, as by disobedience to any rule or order made in the progress of a cause, by nonpayment of costs awarded by the court upon a motion, or by nonobservance of awards duly made by arbitrators or umpires after having entered into a rule for submitting to such determination. . Indeed, the attachment for most of this species of contempts, and especially for non-

payment of costs and nonperformance of awards, is to be looked upon rather as a civil execution for the benefit of the injured party, though carried on in the shape of a criminal process for a contempt of the authority of the court. And therefore it hath been held that such contempts, and the process thereon, being properly the civil remedy of individuals for a private injury, are not released or affected by the general act of pardon."

It will be observed that the learned commentator is careful to limit civil contempts to the disobedience of orders made in the nature of civil execution for the benefit of the injured party. The commitment in such instances is upon civil process, and is coercive, to compel obedience to the order. When the order is complied with, the restraint is at an end. We are not here confronted with such a case. This is an alleged disobedience of a decree of injunction restraining the defendants from doing certain acts injurious to the complainant. It comes within the general classification of criminal contempts. The penalty is imposed by way of punishment, and is inflicted not for the benefit of the complainant, but on behalf of the public, to prevent a repetition of the offense in similar cases.

In the leading case of *Bessette* v. *W. B. Conkey Co.* 194 U. S. 324, 48 L. ed. 997, 24 Sup. Ct. Rep. 665, Mr. Justice Brewer, in distinguishing between civil and criminal contempts, quoted with approval from the opinion of Judge Sanborn of the court of appeals of the eighth circuit in *Re Nevitt,* 54 C. C. A. 622, 632, 117 Fed. 448, 458, as follows: "Proceedings for contempts are of two classes, those prosecuted to preserve the power and vindicate the dignity of the courts, and to punish for disobedience of their orders, and those instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the court has found them to be entitled. The former are criminal and punitive in their nature, and the government, the courts, and the people are interested in their prosecution. The latter are civil, remedial, and coercive in their nature, and the parties chiefly in interest in their conduct and prosecution are the individuals whose private rights and

remedies they were instituted to protect or enforce. *Thompson v. Pennsylvania R. Co.* 48 N. J. Eq. 105, 108, 21 Atl. 182; *Hendryx* v. *Fitzpatrick* (C. C.) 19 Fed. 810; *Ex parte Culliford,* 8 Barn. & C. 220; *R.* v. *Edwards,* 9 Barn. & C. 652; *People ex rel. Munsell* v. *Oyer & Terminer Ct.* 101 N. Y. 245, 247, 54 Am. Rep. 691, 4 N. E. 259; *Phillips* v. *Welch,* 11 Nev. 187, 190; *State* v. *Knight,* 3 S. D. 509, 513, 44 Am. St. Rep. 809, 54 N. W. 412; *People ex rel. Gaynor* v. *McKane,* 78 Hun, 154, 160, 28 N. Y. Supp. 981; 4 Bl. Com. 285; 7 Am. & Eng. Enc. Law, p. 68. A criminal contempt involves no element of personal injury. It is directed against the power and dignity of the court, and private parties have little, if any, interest in the proceedings for its punishment. But, if the contempt consists in the refusal of the party or the person to do an act which the court has ordered him to do for the benefit or the advantage of a party to a suit or action pending before it, and he is committed until he complies with the order, the commitment is in the nature of an execution to enforce the judgment of the court, and the party in whose favor that judgment was rendered is the real party in interest in the proceedings."

The distinction between civil and criminal contempts seems to be that where the order of the court is made in a civil proceeding solely for the benefit of one of the parties litigant, and is disobeyed by the other party to the suit, an order committing such party for contempt until he yields obedience to the order is a civil proceeding. Such are orders requiring the payment of money or the performing of some act for the benefit of the opposing litigant, and are not matters in which the public is interested. Criminal contempts consist in such disobedience of the mandates or decrees of a court as constitute a defiance of the power and authority of the court. A disobedience or disregard of an order of injunction is usually treated as a criminal contempt.

In the case of *Phillips* v. *Welch,* supra, the contempt consisted in the refusal of a party to obey a decree of injunction restraining him and certain others from diverting water from a stream, to the damage of each other. The court, in determin-

ing whether this constituted a civil or criminal contempt, said: "If the contempt consists in the refusal of a party to do something which he is ordered to do for the benefit or advantage of the opposite party, the process is civil, and he stands committed till he complies with the order. The order in such case is not punitive, but coercive. If, on the other hand, the contempt consists in the doing of a forbidden act, injurious to the opposite party, the process is criminal, and conviction is followed by a penalty of fine or imprisonment, or both, which is purely punitive. In the former case the private party alone is interested in the enforcement of the order, and the moment he is satisfied, the imprisonment terminates; in the latter case the state alone is interested in the enforcement of the penalty. It is true the private party receives an incidental advantage from the infliction of the penalty, but it is the same sort of advantage precisely which accrues to the prosecuting witness in a case of assault and battery, the advantage being that the punishment operates *in terrorem,* and by that means has a tendency to prevent a repetition of the offense. The principle of discrimination between the civil and criminal process for contempt here indicated, though not expressly recognized in any of the cases that have fallen under our observation, is entirely consistent with all the decisions, and is the only means of rendering them consistent with each other. It may, therefore, be considered established by them." In this case the contempt was held to be a criminal one. The court rendered a similar decision in *State* v. *Knight,* 3 S. D. 509, 44 Am. St. Rep. 809, 54 N. W. 412, where the offense consisted in disobeying an order of injunction restraining the foreclosure of a mortgage. To the same effect are the following cases: *Baltimore & O. R. Co.* v. *Wheeling,* 13 Gratt. 57; *Thompson* v. *Pennsylvania R. Co.* 48 N. J. Eq. 105, 21 Atl. 182; *New Orleans* v. *New York Mail S. S. Co.* 20 Wall. 387, 22 L. ed. 354; *Worden* v. *Searls,* 121 U. S. 14, 30 L. ed. 853, 7 Sup. Ct. Rep. 814.

Both the Federal and State courts have generally regarded the disobedience of an injunctive order, where the order does not involve the performance of some act for the exclusive bene-

fit of a party litigant, as a criminal contempt, and have univer-
sally refused, in the absence of a bill of exceptions or its equiva-
lent, appearing in the record, to consider the facts on appeal.
A recent decision, strongly in point, is found in the case of *Con-
tinental Gin Co.* v. *Murray Co.* 89 C. C. A. 563, 162 Fed.
873, in which the Murray Company brought suit against the
Continental Gin Company in the circuit court for the district
of Delaware, alleging infringement of patents.    The circuit
court entered an interlocutory decree against the Gin Company
for an injunction and account.    The injunction restrained de-
fendants generally from making, using, or selling the articles
with respect to which the infringement was alleged.    Subse-
quently, on motion of the Murray Company in the same pro-
ceeding, the plaintiffs in error were adjudged guilty of contempt
for disobedience of the injunction, and ordered to pay a fine of
$250 to the United States, and $500 to the complainant as
counsel fee and the costs of the proceeding.    The matter was
brought to the circuit court of appeals upon writ of error, but
no bill of exceptions appeared in the record.    Mr. Justice
Moody, delivering the opinion of the court, held that, while
judgment in contempt may be reviewed in the circuit court of
appeals by writ of error, in the absence of the evidence adduced
at the hearing of the contempt proceeding in the court below
appearing in the record by bill of exceptions, "there is no record,
in the proper sense of the word, in which the assignment of error
can be applied, and, in the further absence of any finding of
facts or special verdict or request for ruling upon the facts
or upon questions of law, there is nothing left in the record to
consider except the motion for attachment, the order to show
cause, and the judgment."

    The order finding the defendants guilty of contempt was not
an interlocutory order in the injunction proceeding.    It was in
a separate action, one personal to the defendants, with the de-
fendants on one side and the court vindicating its authority
on the other.    In *Alexander* v. *United States,* 201 U. S. 117,
50 L. ed. 686, 26 Sup. Ct. Rep. 356, a witness refused to
answer certain questions and produce certain books, on the

ground of immateriality, claiming immunity also under the 5th Amendment to the Federal Constitution. The court overruled the objections, and ordered him to answer the questions and produce the books. The order left the witness no alternative but to obey or answer for contempt. The court held that the order was interlocutory in the original suit, from which an appeal would not lie; but that, if the witness had been punished for contempt, it would constitute a separate, independent action from which an appeal would lie. In referring to this distinction, the court said: "This power to punish being exercised, the matter becomes personal to the witness and a judgment as to him. Prior to that, the proceedings are interlocutory in the original suit. This is clearly pointed out by Circuit Judge Van Devanter, disallowing an appeal from an order like those under review, in the case of *Nelson* v. *United States* (No. 490), in error to the circuit court of the United States for the district of Minnesota. The learned judge said: 'I am of opinion that the mere direction of the court to the witnesses to answer the questions put to them and to produce the written evidence in their possession is not a final decision; that it more appropriately is an interlocutory ruling or order in the principal suit, and that, if the witnesses refuse to comply with it, and the court then exercises its authority, either to punish them or to coerce them into compliance, that will give rise to another case or cases to which the witnesses will be parties on the one hand and the government, as a sovereign vindicating the dignity and authority of one of its courts, will be a party on the other hand.' "

The offense here charged is a criminal one, from which an appeal will lie; but the failure to include in the record a bill of exceptions or its equivalent closes the record so far as this inquiry is concerned, except as to the petition, answers, citation, and judgment. In the absence of a bill of exceptions, we must presume that the evidence was sufficient to establish the truth of each charge contained in the petition of which the trial justice found the defendants guilty. Our inquiry, therefore, is limited solely to questions of law.

This brings us to a consideration of the charges contained in the petition. It appears, among other things, that between the date when the court announced its decision granting the temporary injunction and the date of filing the bond required, by the complainant, the defendants Gompers and Morrison advanced the issue and circulation of the January, 1908, edition of the American Federationist, and printed therein the name of complainant in the "Unfair" or "We Don't Patronize" list. For this the trial justice found the defendants guilty of contempt. It is contended by counsel for defendants that the temporary restraining order did not become operative until the filing of the bond, and that, until the required undertaking had been filed, there could be no disobedience of the order. We need not express an opinion on this point. The defendants were found guilty of circulating through the American Federationist, after the injunction became effective, the "Unfair" or "We Don't Patronize" list with complainant's name thereon, as published in the said January, 1908, and previous editions of that paper. It is charged, and found to be true by the trial court, that this circulation continued up to the date of the filing of the petition in this cause. It is also charged in the petition, and found to be true, that the defendants Gompers and Morrison published and circulated through the American Federationist articles calling the attention of the members of the American Federation of Labor and their friends throughout the country to the injunction issued by the court below in such a manner as to cause their followers to disregard and disobey the same, the intended effect of which was to injure and interfere with complainant's business and the sale of its product, and to restrain the membership of the American Federation of Labor and the public generally from patronizing the complainant, and to continue and maintain the boycott against the business of complainant. The following expressions appear in the articles so published:

"With all due respect to the court, it is impossible for us to see how we can comply with all the terms of this injunction. * * * This injunction cannot compel union men or their friends to buy the Buck's stoves and ranges. For this reason,

the injunction will fail to bolster up the business of this firm, which it claims is so swiftly declining.

"Individuals, as members of organized labor, will still exercise the right to buy or not to buy the Buck's stoves and ranges. It is an exemplification of the saying that 'You can lead a horse to water, but you can't make him drink;' and more than likely these men of organized labor and their friends will continue to exercise their right to purchase or not purchase the Buck's stoves and ranges.

"The publication of the Buck's Stove & Range Company on the 'We Don't Patronize' list of the American Federation of Labor is only an incident in the history of the case. These stoves might have been left as severely alone by purchasers if they had never been mentioned on that list. It is not the matter of removing that firm from the list against which we primarily protest, it is this injunction invading the freedom of the press.

"The temporary injunction issued by Justice Gould, of the court of equity, of the District of Columbia, in the (Van Cleave) Buck's Stove & Range Company of St. Louis against the American Federation of Labor, its officers and all others, has been made permanent. The case will now be carried to the court of appeals of the District of Columbia.

"It should be borne in mind that there is no law, aye, not even a court decision, compelling union men or their friends of labor to buy a Buck's stove or range. No, not even to buy a Loewe hat.

"Bear in mind that an injunction issued by a court in no way compels labor or labor's friends to buy the product of the Van Cleave Buck's Stove & Range Company of St. Louis.

"Fellow workers, be true and helpful to yourselves and to each other. Remember that united effort in cause of right and just must triumph."

It will be observed that in each of the above publications, the members of the American Federation of Labor *and their friends* are combined together. This is most significant, and, in the

conditions then existing, was manifestly intended to encourage and counsel a continuation of the forbidden acts.

It is charged in the petition that, on numerous occasions, while the injunction was in full force and effect, the defendant Gompers gave utterance to similar statements in public speeches. For example, in a speech delivered before a public gathering of working people on May 1, 1908, in the city of Chicago, Illinois, Gompers said:

"I might say just parenthetically about the hatters' case that you are not now permitted to boycott the Loewe hats, but I want to call your attention to the fact that there is no law compelling you to wear a Loewe hat, nor has any judge issued a mandamus compelling you to buy a Loewe hat. That applies equally to Mr. Van Cleave's stoves and ranges. And, by the way, I don't know why you should buy any of that sort of stuff. I won't; but that is a matter to which we can refer more particularly in our organizations."

In a public address to the working people of New York city on the 19th of April, 1908, Gompers made the following statement:

"Of course, in the case of the Buck's Stove & Range Company, if I told you that the Buck's Stove & Range Company was still unfair, when I got back to Washington to-morrow, or some place where they say people play checkers with their noses—well, as I say, I am not prepared to tell you that these things are unfair. But there is no law, no court decision, that compels you to buy them, nor does any law compel you to buy anything without the union label."

It was found by the court below to be a fact, not only that these statements were made as charged, but that they were made with the intent of inciting the membership of the American Federation of Labor and their friends to continue the boycott against the business of complainant in defiance of the decree of the court. The defendants having been found guilty of the offenses above charged, in the absence of the evidence from the record, the sole question left for us to consider is

whether, under the circumstances, they constitute contempt of court.

It must be remembered that the injunction affected directly and indirectly several millions of the people of the United States. The decree did not run alone against these defendants, but against about two million members of the American Federation of Labor throughout the country. Hence, it is proper to consider the effect of the acts of the defendants upon this membership and the persons who had formerly been prevented by the boycott from patronizing the complainant. While these acts, if they had affected only the conduct of the defendants, or if the injunction had been against them alone, might not have amounted to more than a comment or criticism of the action of the court, yet, if the remarks, when published and uttered, were such as to tend to inflame their followers into a feeling of resentment to the decree of the court and lead to disobedience of its commands, the defendants would be chargeable with contempt for producing this result. Contempt may be committed by innuendo and insinuation. It may consist in maliciously saying or doing anything that will have a tendency to induce others to disregard the authority of the court. While the publications and utterances before us may not, when literally interpreted, constitute a technical contempt, yet, if the manifest intent of the defendants was not only to disobey the order of the court themselves, but also to inspire their followers to do likewise, it may be regarded as a punishable contempt. We think it is this sort of an offense of which the defendants are here guilty.

The boycott waged by the American Federation of Labor against the business of complainant had become so acute and extensive that the terms "boycott," "unfair," and "we don't patronize," when used in connection with complainant's name, had acquired such a significance to the organization and its friends that the mere printing or uttering of the name in that connection was a signal to the membership and their friends not to deal with the complainant or persons having business relations with it. As Mr. Justice Robb said in the opinion of

this court in the former case (33 App. D. C. 83), referring to the "Unfair" or "We Don't Patronize" list: "The court below found, and in that finding we concur, that this list in this case constitutes a talismanic symbol indicating to the membership of the Federation that a boycott is on and should be observed." The mere mention of complainant's name by these leaders in the columns of the Federationist or on the public platform in connection with the expressions "boycott," "unfair," or "we don't patronize," might tend to influence many to disregard the decree of the court, and thus become as effective notice to their followers as it had formerly been when published in the "Unfair" or "We Don't Patronize" list. We are convinced that the acts charged were committed by the defendants for the express purpose of nullifying the order of the court, in the belief that they were technically avoiding the charge of contempt. The acts of these defendants, taken as a whole, can produce in the mind of any reasonable person but one impression,—a concerted, well-planned effort to encourage the membership of the American Federation of Labor and their friends to disregard and disobey the orders of the court, and to create among their followers and their sympathizers a lack of respect for the authority and dignity of the court.

In paragraph 18 of the petition, the defendant John Mitchell is charged with presiding over and taking part in the deliberations of a convention of the United Mine Workers of America on the 25th of January, 1908, at which a resolution was adopted, placing the product of the complainant on the "unfair" list, and fining any member of the organization $5 for purchasing a stove manufactured by complainant; providing that, for nonpayment of the fine, expulsion from the order should be imposed as a penalty. The defendant in his answer admits that he was present and presided over the convention, but disclaims any knowledge of either the consideration or passage of the resolution, until his attention was called to it by the filing of the petition herein. Upon this important issue of fact, owing to the absence of the evidence from the record, we must ac-

cept the conclusion of the trial justice as to the truth of these charges and the guilt of the defendant.

The adoption of this resolution could accomplish but one end,—the perpetuation and continuation of the boycott. A labor organization can conduct an unlawful boycott as effectually by compelling its own members to refrain from dealing with the party boycotted, as by coercing others into similar action. The wilful participation of the defendant being established, the act charged constituted a separate and complete offense, committed in open and brazen disobedience of the express commands of the court.

In addition to finding the defendants guilty of the foregoing offenses, as charged, they were also found guilty of numerous other offenses charged in the petition. Since, however, the finding of guilt on the counts or charges above considered is sufficient to support the judgment of the court, and the penalty imposed is not greater than could have been inflicted had they constituted the only offenses charged, it will not be necessary to consider the other offenses charged in the petition of which the defendants were found guilty. In a criminal proceeding, where the accused is found guilty as charged under an indictment containing numerous counts, the judgment will not be reversed, though some of the counts are bad, if the good ones are sufficient to support the judgment.

In *Claassen* v. *United States,* 142 U. S. 140, 35 L. ed. 966, 12 Sup. Ct. Rep. 169, where the defendant had been convicted of embezzlement on five different counts, the court considered the first count, which it found to be sufficient to support the verdict, and refused to consider the other counts, stating: "This count and the verdict of guilty returned upon it being sufficient to support the judgment and sentence, the question of the sufficiency of the other counts need not be considered. In criminal cases, the general rule, as stated by Lord Mansfield before the Declaration of Independence, is, 'that, if there is any one count to support the verdict, it shall stand good, notwithstanding all the rest are bad.' *Peake* v. *Oldham,* 1 Cowp. 275, 276; *R.* v. *Benfield,* 2 Burr. 980, 985. See also *Grant* v.

*Astle,* 2 Dougl. K. B. 722, 730. And it is settled law in this court, and in this country generally, that, in any criminal case, a general verdict and judgment on an indictment or information containing several counts cannot be reversed on error if any one of the counts is good and warrants the judgment, because, in the absence of anything in the record to show the contrary, the presumption of law is that the court awarded sentence on the good count only. *Locke* v. *United States,* 7 Cranch, 339, 344, 3 L. ed. 364, 365; *Clifton* v. *United States,* 4 How. 242, 250, 11 L. ed. 957, 961; *Snyder* v. *United States,* 112 U. S. 216, 28 L. ed. 697, 5 Sup. Ct. Rep. 118; *Bond* v. *Dustin,* 112 U. S. 604, 609, 28 L. ed. 835, 836, 5 Sup. Ct. Rep. 296; 1 Bishop, Crim. Proc. § 1015; Wharton, Crim. Pl. & Pr. § 771. * * * In the case now before us * * * the jury did not return a general verdict against the defendant on all the counts, but found him guilty of the offenses charged in each of the five counts now in question. This being the case, and the sentence being to imprisonment for not less than five years nor more than ten, which was the only sentence authorized for a single offense under the statute on which the defendant was indicted, there is no reason why that sentence should not be applied to any one of the counts which was good." Applying to the case at bar this wholesome rule in the enforcement of criminal law, the order of the court below, finding the defendants guilty of the charges herein considered, is sufficient to support the penalty imposed by the court. Hence, further consideration of this branch of the case is unnecessary.

That the supreme court of the District of Columbia has jurisdiction of contempt proceedings growing out of the disobedience of its lawful orders will be conceded. But it is contended that the court below exceeded its jurisdiction in entering the decree for the disobedience of which the defendants are held in contempt. On appeal, this court modified that decree. It is insisted that the defendants are held for disobedience of those parts of the order of injunction which were, on appeal, eliminated. It is, therefore, urged that, inasmuch as the portions of the decree eliminated were held to be an invasion of the con-

stitutional rights of free speech and a free press, under the 1st Amendment to the Constitution of the United States, the court was therefore without jurisdiction, and the portion of the decree thus eliminated was totally void, and not binding upon these defendants.

On the other hand, it is insisted by counsel for complainant that the court below had jurisdiction to hear and determine the injunction case and enter a decree therein restraining the defendants from continuing the boycott; that, having jurisdiction to enter such a decree, the modification thereof on appeal involved merely the correction of error, and cannot affect the court's jurisdiction; and that the decree became a final and binding judgment against the defendants, until reversed or modified on appeal.

On this point, we find it unnecessary to express an opinion. As to the specific offenses herein considered, the petition charges a direct violation of those provisions of the original decree which were, on appeal, affirmed and approved by this court. We need not, therefore, consider the effect of the alleged disobedience by the defendants of such parts of the original restraining order as were subsequently eliminated by us; hence, for the purposes of this case, we may dismiss all further reference to the 1st Amendment to the Constitution of the United States.

With great eloquence, counsel urged at bar the high character of the defendants and the distinguished position which they have attained among their fellowmen as matters to be considered by us in reviewing the judgment of the court below. Such an argument might with propriety be addressed to the pardoning power, but the court should not be biased by such considerations.

We have a deep sense of the far-reaching importance of this case. Three distinguished citizens, leaders in a great cause for the improvement and uplift of their fellow men, with a larger following, propably, than was ever marshaled under single leadership in any philanthropic movement, are at the bar of justice to answer the charge of disobedience of an order of a court of the United States. We are not unmindful of the high

position which the defendants have attained, but their intelligence forbids any inference or conclusion that the acts charged were committed by them in ignorance of their duty to the courts of their country; hence, that excuse cannot be advanced with convincing force.

The courts are the agencies appointed by the Constitution for dispensing justice and for the orderly adjudication of controversies arising from conflicting interests. There, all must stand upon exact equality. The law knows no distinction. The rich and the poor, the intelligent and the ignorant, irrespective of race or color, are entitled to equal protection, and the scales of justice should be balanced without favor or prejudice. Government, in its most liberal form, is harsh; law is restrictive; but organized government must exist for the preservation of society. Hence, whether just or unjust, correct or incorrect, the mandates of its appointed agencies cannot be subjected to individual disrespect and disobedience. The sole question before us is the guilt or innocence of the defendants. The high distinction which they have attained, the fairness or unfairness of the Buck's Stove & Range Company and the larger organization to which it belongs, the National Manufacturers' Association, are not matters to be here considered. Neither are we, as a court of review, permitted to modify or extenuate the extreme penalty imposed. These matters, as we have suggested, may be presented properly to the officer vested with authority to commute or pardon.

Individual interests dwindle into insignificance when compared with the higher principle involved in this cause. The fundamental issue is whether the constitutional agencies of government shall be obeyed or defied. The mere fact that the defendants are the officers of organized labor in America lends importance to the cause and adds to the gravity of the situation, but it should not be permitted to influence the result. If an organization of citizens, however large, may disobey the mandates of the courts, the same reasoning would render them subject to individual defiance. The one has no greater rights

in the eyes of the law than the other.    Both are subject to the law, and neither is above it.

The inherent power of the court to preserve an orderly administration of its affairs, and to enforce its orders and decrees, has always been recognized.    In many instances, as in the case at bar, punishment for contempt is the only means by which the court can enforce its lawful decrees.    With a proper exercise of this power, the purpose of its creation and organization is made effective: without it, it would become an impotent and a useless adjunct of government.    If a citizen, though he may honestly believe that his rights have been invaded, may elect when, and to what extent, he will obey the mandates of the court and the requirements of the law as interpreted by the court, instead of pursuing the orderly course of appeal, not only the courts, but government itself, would become powerless, and society would soon be reduced to a state of anarchy.

The judgment is affirmed with costs, and it is so ordered.

*Affirmed.*

Mr. Justice ROBB, concurring:

I concur in the opinion and conclusion of Mr. Justice Van Orsdel, and desire to add but a word on one point.    The contention is put forward that the opinion of the learned justice who awarded sentence below should be considered here, and that, if it is, it will appear therefrom that the finding of guilt and the fixing of punishment were based upon conduct of the defendants antecedent to the issuance of the restraining order. I agree with Mr. Justice Van Orsdel that we are not at liberty to consider that opinion on this appeal.    Assuming, however, that it is properly before us, it seems to me clear that, unless it is given a forced and unreasonable construction, it will not sustain the above contention.

After a recital of acts tending to show predetermination to violate the injunction, the learned justice below said: "Having in mind what may be in the foregoing delineation which indicates that either of the three respondents did, before the issu-

ance of the injunction, deliberately determine to wilfully violate it, and did counsel others to do the same, let us now turn to their sayings and doings since the decision of Mr. Justice Gould was formally announced and the order of injunction itself put into technical operation by the giving of the injunction bond."

This language, to my mind, conclusively shows that the conduct of the defendants antedating the injunction was considered only on the question of intent, which the court was entirely justified in doing. To hold otherwise would be to convict the court of ignorance of the law in holding the defendants guilty of violating an injunction long before it was issued.

Mr. Chief Justice SHEPARD, dissenting:

I am unable to concur in affirming the decree appealed from for reasons which I shall state as briefly as I can.

1. As regards the conclusion that this proceeding must be regarded as criminal solely, and, in consequence, that the evidence upon which the conviction rests cannot be considered, because not presented in a bill of exceptions reserved on the hearing, I will content myself with saying that I am not clearly convinced that it must be so regarded. The complaint was made by the complainant, on whose behalf the injunction had been granted, and for its own redress. No fine was imposed on behalf of the United States. The relief sought in the original bill was not pecuniary. The punishment by imprisonment for disobedience of the writ was the only way in which the relief sought could be secured. For these reasons, the proceeding might well be regarded as ancillary to the main suit, the order as one entered in execution of the decree made therein, and therefore, the evidence might not only be taken, but considered also in accordance with the practice in equity cases, notwithstanding the fact that the language contained in the opinion of the trial justice and the unusual severity of his sentence indicated that he regarded the proceeding as punitory, and not remedial.

2. Assuming that the proceeding is criminal in its nature,

there being no bill of exceptions, the presumption follows that the allegations of the complaint found to be true were supported by satisfactory evidence.  Whether the record of complaint and decree upon which the case has been considered may be supplemented by the opinion of the court, filed in the cause and made a part of the record, is a question that will be considered later.

The complaint consists of twenty-six paragraphs.  It has been ordered to be printed in the report of the case, and need not be repeated or summarized.  An examination of it will show that the first fifteen paragraphs charge conduct and language used by respondents in public meetings, long antedating the commencement of the original suit; some occurring in the year 1897, and long before any controversy had arisen.  The sixteenth paragraph is the first that charges any act subsequent to the order for the injunction, and in disobedience thereof. The order was announced December 17th, 1907, and entered on December 18th, directing the injunction to issue upon the execution of a bond in the usual form by the complainant.  The order was to the effect that the injunction "shall be in full force, obligatory and binding upon the defendants," etc., provided the complainant shall first execute the necessary bond. This order was in compliance with equity rule 42, of the supreme court of the District of Columbia, which makes the execution and approval of the bond a "precedent condition."

This bond was not given until December 23.  The specific charge is that, after the granting of the order, and before the giving of the bond, the respondents Gompers and Morrison hastened to deposit in the mails the already-printed January number of the American Federationist, which contained the publication of complainant's name in the "Unfair" list.  It is not charged that any subsequent issue of the journal contained a similar publication.  Some general allegations respecting the circulation of the January number of the Journal are too vague to form the foundation of a criminal charge and conviction.  The gist of the charge is this "rushing" of the journal in the mails between December 17th and 23d.  The decree con-

victing the respondents cannot be supported on this charge, because the order for the injunction did not become operative and effective before compliance with the precedent condition.

In the earlier equity practice an injunction was issued without bond, and was, therefore, effective from the moment of granting the order. In such case, if an injunction was improvidently granted, the defendant had no redress for the injuries he might sustain thereby. To remedy the great mischief resulting from this practice, courts of equity began to require bonds when, in their discretion, it seemed just to do so. But modern statutes, and rules of court authorized by statute, have, in general, gone much farther and required bonds as conditions precedent to the taking effect of the order. Equity rule 42 is one of these. Adopted by express authority of Congress, it has all the force of a statute. Until the bond be given, the order for the injunction is clearly inoperative, without effect or obligation. This has been held by the court which promulgated the rule. *Lamon* v. *McKee,* 7 Mackey, 446.

This question was reconsidered by this court in a recent case and the same conclusion reached. *Drew* v. *Hogan,* 26 App. D. C. 55–62, 6 A. & E. Ann. Cas. 589. Similar statutes and rules have received the same construction throughout the country. *Clarke* v. *Hoomes,* 2 Hen. & M. 23; *Winslow* v. *Nayson,* 113 Mass. 411–421; *Diehl* v. *Friester,* 37 Ohio St. 473; *Elliott* v. *Osborne,* 1 Cal. 396; *State ex rel. Bradford* v. *Rush County,* 35 Kan. 150–155, 10 Pac. 535; *State ex rel. Wilson* v. *Kearny County,* 42 Kan. 739–748, 22 Pac. 735; *Van Fleet* v. *Stout,* 44 Kan. 523, 525, 24 Pac. 960; *Pell* v. *Lander,* 8 B. Mon. 554, 556; *Davis* v. *Dixon,* 1 How. (Miss.) 64–67, 26 Am. Dec. 695; *State ex rel. Downing* v. *Greene,* 48 Neb. 327–332, 67 N. W. 162; *Marlatt* v. *Perrine,* 17 N. J. Eq. 49–51; *Lawton* v. *Richardson,* 115 Mich. 12, 72 N. W. 988; *Carpenter* v. *Keating,* 10 Abb. Pr. N. S. 223.

3. Coming now to the remaining paragraphs, excepting that relating to the respondent John Mitchell, I find that they contain references to the effect of the injunction, in an "urgent appeal" to the friends of the labor organization to aid with

funds in the prosecution of an appeal from the order, as well as declarations in speeches made in public meetings. In the view of my brethren, these show an express contempt of the court granting the injunction, as well as an attempt to incite others to disobey it. There is no allegation that any act enforcing the boycott which had been enjoined has been committed by the respondents or any of their adherents. So far as it was declared that the injunction did not compel anyone to purchase the goods of the complainant, the declaration was the statement of a fact. The language used was in bad taste, under all the circumstances, but seems to have been directed to the assertion of the right of free speech and free publication for which the respondents were then and are now contending. Had these publications and speeches been followed by acts renewing or continuing the boycott, as that had been defined by this court, I grant that they might have been considered as circumstances, among others, tending to show that they were intended to incite others to disobey the injunction. That they were not so regarded by those so completely under the influence of the respondents affords some inference that they were not so intended.

The last paragraph (26) is so general and vague that it cannot form a sufficient foundation for a judgment of conviction of crime. It seems to be the statement of a general conclusion from the facts previously charged, in the nature of a general conclusion of an ordinary common-law indictment.

4. In the opinion of the majority of the court it is substantially conceded that some of the charges in the complaint of which respondents were found guilty do not show anything done in disobedience of the writ. They say: "In addition to finding the defendants guilty of the foregoing offenses as charged, they were also found guilty of numerous other offenses charged in the petition. Since, however, the finding of guilt on the counts or charges above considered is sufficient to support the judgment of the court, and the penalty imposed is not greater than could have been inflicted had they constituted the only offenses charged, it will not be necessary to consider the other offenses charged in the petition of which the defendants were found

guilty. In a criminal proceeding where the accused is found guilty as charged under an indictment containing numerous counts, the judgment will not be reversed; though some of the counts are bad, if the good ones are sufficient to support the judgment."

Assuming the analogy between the two cases as stated, the general doctrine is in accordance with the law as laid down by the Supreme Court of the United States in *Claassen* v. *United States,* 142 U. S. 140–146, 35 L. ed. 966–968, 12 Sup. Ct. Rep. 169, and other cases. But the presumption of law that, in such a case, the sentence was on the good count solely, can only be indulged "in the absence of anything in the record to show the contrary." It is very clear that the presumption cannot be indulged if we can be permitted to consider the opinion of the learned justice who awarded the sentence. That opinion has been made a part of the transcript in accordance with paragraph F, rule 5, of this court, and is found in the printed record, of which it fills fifty-four pages. It undertakes a recital of all the facts found, under two heads entitled as follows: "Conditions anteceding the injunction," and "Since the injunction." The statement of antecedent conditions covers thirty-one of the fifty-four pages. This opinion shows conclusively that the finding of guilt and the extreme severity of the punishment were based upon the antecedent conduct and declarations of the defendants, as well as upon those in the paragraphs or counts aforesaid. In my judgment, justice demands that this opinion be considered as what it is; namely, the special findings of fact on which the decree is founded and by which it must be tested.

5. The complaint states one specific charge of violation of the injunction by the respondent Mitchell alone; namely, his presiding over and participating in a meeting of the United Mine Workers of America in Indianapolis, on June 25th, 1908, and approving a resolution then and there adopted reciting the controversy between the complainant and "Organized Labor," and imposing a fine of $5 upon any member who shall thereafter purchase a stove of complainant's manufacture. This was an

act violating both the original and the modified decree for injunction that was then in force. It appears, however, from the findings of fact in the opinion aforesaid, relating to the defendant Mitchell, that the court took into consideration certain other acts and declarations of said Mitchell. These comprise statements made in a book published by him in 1903, declarations in a speech made before the National Civic Federation, December 13, 1906, to the effect that, if a court should "enjoin him from doing something he had a legal, constitutional, and moral right to do, he would violate the injunction," and his affixing his signature to the "urgent appeal" before mentioned.

When we consider the severity of the sentence of Mitchell, I think it impossible to say that it was not founded in part upon the foregoing declarations, which long antedated the controversy with the complainant.

Upon the assumption that each and all of the defendants committed some acts in violation of the injunction, both as originally issued and as modified on appeal, I am of the opinion that the decree should be reversed and the case remanded for trial upon evidence confined to the real question involved.

6. There is another and stronger reason for my dissent so far as the respondents Gompers and Morrison are involved. The specific acts charged against them relate wholly to declarations and publications which violated the preliminary injunction as issued. I have heretofore expressed the opinion that so much of the injunction order was null and void because opposed to the constitutional prohibition of any abridgment of the freedom of speech or of the press. (33 App. D. C. p. 129.) Subsequent reflection has confirmed the views then expressed. I concede that the court had jurisdiction of the subject-matter of the controversy and of the parties, but I cannot agree that a decree rendered in excess of the power of the court—a power limited by express provision of the Constitution—is merely erroneous, and not absolutely void. That proposition is met and conclusively disposed of by Mr. Justice Miller in *Ex parte Lange,* 18 Wall. 163–175, 21 L. ed. 872–878. I quote therefrom as follows: "But it has been said that, conceding all this,

the judgment under which the prisoner is now held is erroneous, but not void; and, as this court cannot review that judgment for error, it can discharge the prisoner only when it is void. But we do not concede the major premise in this argument. A judgment may be erroneous, and not void, and it may be erroneous *because* it is void. The distinctions between void and merely voidable judgments are very nice, and they fall under the one class or the other as they are regarded for different purposes. * * * It is no answer to this to say that the court had jurisdiction of the person of the prisoner, and of the offense under the statute. It by no means follows that these two facts make valid, however, erroneous it may be, any judgment the court may render in such case."

In a later case, the same justice said: "When, however, a court of the United States undertakes, by its process of contempt, to punish a man for refusing to comply with an order which that court had no authority to make, the order itself, being without jurisdiction, is void, and the order punishing for the contempt is equally void." *Ex parte Fisk,* 113 U. S. 713–718, 28 L. ed. 1117–1119, 5 Sup. Ct. Rep. 724. To the same effect are *In Re Snow,* 120 U. S. 274–285, 30 L. ed. 658–662, 7 Sup. Ct. Rep. 556; *Re Ayers,* 123 U. S. 443–485, 31 L. ed. 216–223, 8 Sup. Ct. Rep. 164; *Re Nielsen,* 131 U. S. 176–183, 33 L. ed. 118–120, 9 Sup. Ct. Rep. 672; *Windsor* v. *McVeigh,* 93 U. S. 274, 283, 23 L. ed. 914, 917.

In *Nielsen's Case,* Mr. Justice Bradley stated the rule here contended for as follows: "It is difficult to see why a conviction and punishment under an unconstitutional law is more violative of a person's constitutional rights than an unconstitutional conviction and punishment under a valid law. In the first case, it is true, the court has no authority to take cognizance of the case; but, in the other, it has no authority to render judgment against the defendant. This was the case of *Ex parte Lange,* where the court had authority to hear and determine the case, but we held that it had no authority to give the judgment it did. It was the same in the case of Snow; the court had authority over the case, but we held that it had no authority to

give judgment against the prisoner. He was protected by a constitutional provision, securing to him a fundamental right. It was not a case of mere error in law, but a case of denying to a person a constitutional right." See also *Re Frederich,* 149 U. S. 70–76, 37 L. ed. 653–656, 13 Sup. Ct. Rep. 793; *Re Bonner,* 151 U. S. 242–256, 38 L. ed. 149–151, 14 Sup. Ct. Rep. 323.

Convinced that the court was without authority to make the only order which the defendants Gompers and Morrison can be said to have disobeyed, I can have no other opinion than that the decree should be reversed.

A petition by the appellants to the Supreme Court of the United States for the issuance to this court of the writ of certiorari removing the cause to that court for review, was granted December 9, 1909.